RANDY PICKETTS, EXECUTOR (ESTATE OF LINDA ANN PICKETTS), ET AL. *v.* INTERNATIONAL PLAYTEX, INC., ET AL.
(13839)

PETERS, C. J., SHEA, CALLAHAN, GLASS and HULL, Js.

Argued April 3—decision released June 26, 1990

*Michael P. Koskoff*, with whom was *Rosalind J. Koskoff*, for the appellants (plaintiffs).

*Stephen D. Chakwin, Jr.*, with whom were *J. Paul Johnson, Sharon A. Fitzgerald* and, on the brief,

*W. Patrick Ryan, Holly K. Dustin* and *William H. Robinson,* for the appellees (defendants).

PETERS, C. J. The sole issue in this appeal is whether the trial court abused its discretion in granting a motion to dismiss on the ground of forum non conveniens. On March 12, 1985, Linda Ann Picketts, a thirty-three year old mother of two children, died in British Columbia, Canada of toxic shock syndrome[1] allegedly caused by a defectively designed "super absorbent" Playtex tampon. The plaintiffs, Randy Picketts, individually and in his capacities as both the executor of his wife's estate and as the next friend of the decedent's minor children, Leanne and Dean Picketts, all Canadian citizens, subsequently brought an action in Connecticut based on strict liability, negligence and breach of implied warranties against three Playtex companies. The defendants are International Playtex, Inc., a now liquidated Delaware corporation that had its principal place of business in Stamford, Connecticut, Playtex Family Products Corporation, a Delaware corporation with its principal place of business in Stamford, Connecticut, that had assumed the tampon portion of International Playtex, Inc., upon its liquidation,[2] and Playtex, Ltd., a Canadian corporation with its principal place of busi-

[1] Toxic shock syndrome is a rare but serious multisystem disease, the onset of which is acute, that may cause death. Although toxic shock syndrome occurs among nonusers of tampons, it typically occurs around the state of menses in a young woman using tampons. Epidemiologically, toxic shock syndrome has been associated with the introduction of certain brands of hyperabsorbent tampons. Their prolonged intravaginal use, together with the capacity of the materials used in these tampons to bind magnesium, has been associated with increased growth of staphylococcus aureus, an infectious bacterium. Harrison's Principles of Internal Medicine (11th Ed.) pp. 540–41.

[2] Playtex Family Products Corporation assumed the tampon portion of International Playtex, Inc., including its wholly owned subsidiary, Playtex, Ltd., on December 27, 1986, the date that International Playtex, Inc., was liquidated.

ness in Malton, Ontario, Canada, that had been a wholly owned subsidiary of International Playtex, Inc., and is presently a wholly owned subsidiary of Playtex Family Products Corporation. The defendants moved to dismiss the complaint on the ground that, despite their corporate presence in this state, which conferred territorial jurisdiction over them here, Connecticut was not a proper forum for the action. The trial court, after a hearing, overruled the plaintiffs' objections and granted the motion to dismiss the action in its entirety. We transferred to this court, pursuant to Practice Book § 4023, the plaintiffs' appeal from the forum non conveniens dismissal and now reverse the judgment of the trial court.

The relevant facts may be derived from the plaintiffs' complaint, the limited discovery conducted subsequent to the motion to dismiss and the affidavits and medical reports filed by the parties to support their evidentiary contentions. The decedent, just prior to her death, had purchased and used Playtex super absorbent tampons in British Columbia, Canada. After experiencing symptoms of persistent vomiting and diarrhea that had progressively worsened over the course of a few days, the decedent was taken by ambulance to Penticton Regional Hospital, in British Columbia. During the trip, she stopped breathing and lost her pulse, at which time the ambulance attendants immediately began cardiopulmonary resuscitation. Upon her arrival at the hospital, emergency room personnel vigorously continued resuscitation efforts until the decedent was pronounced dead approximately two hours later.

Although one of the decedent's attending physicians theorized in the patient progress notes that "the most likely explanation for the patient's death [was] asphyxiation, secondary to aspiration of vomitus" that may have been preceded by "[c]ardiac arrhythmia secondary

to hyperkalemia,"[3] the autopsy revealed findings consistent with previously reported cases of toxic shock syndrome.[4] On the basis of these autopsy results, the coroner concluded in his judgment of inquiry into the death of Linda Ann Picketts that she had died as a result of toxic shock syndrome. The coroner further indicated that "[t]he source of the fatal infection [was] thought to be the tampon" removed from her body at the autopsy.

Playtex, Ltd., manufactured the super absorbent tampon implicated in the decedent's death at its facilities in Arnprior, Ontario, and coordinated that tampon's national distribution in Canada from its marketing headquarters in Malton, Ontario. In Canada, such marketing and distribution fall within the regulatory authority of the Health Protection Branch of the Department of National Health and Welfare, the Canadian analogue to the United States Food and Drug Administration. Significantly, however, the product specifications for the tampons manufactured and distributed in Canada by Playtex, Ltd., originated in the research and development department of International Playtex, Inc., in Paramus, New Jersey. Moreover, the product information disseminated by International Playtex, Inc., included the preparation of consumer

[3] Hyperkalemia is an abnormally high potassium concentration in the blood, most often due to defective kidney excretion. R. Sloane, The Sloane-Dorland Annotated Medical-Legal Dictionary p. 354.

[4] The internal examination conducted as part of the autopsy revealed "bilateral purulent material present in both pleural cavities, foul smelling vaginal secretions and a mottled and cyanotic appearance of the uterus." Further microscopic examination attested to "wide-spread acute inflammatory changes in the heart, lymph nodes, breasts and liver," findings "consistent with previously reported cases of fatal toxic-shock syndrome." Fluids removed from the vaginal and pleural cavities indicated heavy growth of staphylococcus aureas, an organism associated with toxic shock, and beta hemolytic streptococci. In addition, peribronchial inflammation found in the lungs suggested a possible secondary infection.

warnings and instructions.[5] Although Playtex, Ltd., had modified the tampon design slightly to adapt to Canadian marketing and production needs, it had undertaken such modification only subsequent to direct approval from International Playtex, Inc., Accordingly, International Playtex, Inc., and its successor, Playtex Family Products Corporation, established the standards for both the Canadian and American versions of the Playtex super absorbent tampon.

Despite the different sources of the raw materials used in the Canadian and American versions, and the utilization of discrete machinery to conform to varying specifications as to size and weight, the super absorbent tampons manufactured and marketed by Playtex, Ltd., in Canada were essentially similar to those manufactured by International Playtex, Inc., for United States distribution.[6] The design specifications

---

[5] The adequacy of a product's design and testing, and the information supplied to formulate the basic package instructions and warnings provide the operative nucleus for a product liability action. The creative or authoritative source of both design specifications and product testing information is thus of material significance to the assignment of liability. See *Carlenstolpe* v. *Merck & Co.*, 638 F. Sup. 901, 908 (S.D.N.Y. 1986), appeal dismissed, 819 F.2d 33 (2d Cir. 1987); *Lake* v. *Richardson-Merrell, Inc.*, 538 F. Sup. 262, 274–75 and n.17 (N.D. Ohio 1982), motion denied sub nom. *Haddad* v. *Richardson-Merrell, Inc.*, 588 F. Sup. 1158 (N.D. Ohio 1984); see *Dow Chemical Co.* v. *Castro Alfaro*, 786 S.W.2d 674, 686, 688–89 (Tex. 1990) (Doggett, J., concurring). In addition to the defendants' disclosure that International Playtex, Inc., not only supplied the product specifications to Playtex, Ltd., but had direct control over any adaptations in design, the defendants have also disclosed that it is the Playtex parent corporations that have been "following and cooperating in the research being developed by the medical profession and various governmental departments with respect to [toxic shock syndrome] and tampon use." It is also the parent corporations that have sponsored microbiological research with respect to toxic shock syndrome at various universities and have provided an unconditional grant to Yale University to study the potential for diagnostic bias with respect to toxic shock syndrome.

[6] On appeal before this court, the defendants maintain that the Canadian product, for purposes of a product liability action, was materially dis-

of the tampon used by the decedent, like its American counterpart, included polyacrylate, a highly absorbent fiber that may have served as the breeding ground for the lethal bacteria that had allegedly developed in the decedent into toxic shock syndrome. In March, 1985, Playtex, Ltd., at the direction of International Playtex, Inc., removed polyacrylate from the fiber composition of its super absorbent tampons. Approximately two weeks after the death of the decedent, Playtex, Ltd., also implemented the product exchange program mandated by the March 29, 1985 decision of International Playtex, Inc., voluntarily to withdraw all Playtex tampons containing polyacrylate from the marketplace.[7]

---

tinguishable from its American counterpart. The trial court, however, expressly found that the two product versions were "essentially similar," and our review of the record indicates no reason to disturb this finding.

[7] Although the defendants maintain that such product exchange fails to constitute a " 'withdrawal from the market,' as [the] defendants understand the term," we take judicial notice of the circumstances that prompted the timing of this "voluntary" action. In a wrongful death action alleging that the decedent's use of tampons caused her death from toxic shock syndrome, a Kansas jury assessed punitive damages in the amount of ten million dollars against International Playtex, Inc. Although the Kansas trial court expressly stated that the punitive award " 'does not bother me, nor shock my conscience' "; *O'Gilvie* v. *International Playtex, Inc.,* 821 F.2d 1438, 1448 (10th Cir. 1987), cert. denied, 486 U.S. 1032, 108 S. Ct. 2014, 100 L. Ed. 2d 601 (1988); it nonetheless "assured counsel for Playtex that substantial modification or complete remittitur would be forthcoming if Playtex should decide to remove its super-absorbent tampons from the market." Id. The trial court extended this invitation on March 21, 1985. International Playtex, Inc., as disclosed in response to an interrogatory filed by the plaintiffs in this case, decided on March 29, 1985, immediately to discontinue worldwide sale of its super absorbent tampon containing polyacrylate. The contemporaneous nature of these two events is not coincidental. Upon Playtex' representations that it had discontinued the sale of its super absorbent product, instituted a program of alerting the public to the dangers of toxic shock syndrome and modified its product warning, the trial court in *O'Gilvie* subsequently reduced the punitive award to one million, three hundred and fifty thousand dollars. Id., 1440–41. As the Tenth Circuit Court of Appeals noted, in concluding that the trial court's order of remittitur constituted error, "we are compelled to point out that the

Although International Playtex, Inc., and its successor, Playtex Family Products Corporation, had chosen Stamford as the most convenient place from which to conduct their worldwide enterprises, the defendants nonetheless asserted that Connecticut was an inconvenient forum in which to defend this action brought by Canadian citizens alleging defective design of a product regulated by the Canadian government and manufactured and distributed by their wholly owned Canadian subsidiary, Playtex, Ltd. The defendants made a twofold argument in reliance on the objective of the doctrine of forum non conveniens that litigation of an action should go forward in the most convenient and logical place. They noted, first, that, since neither the decedent nor her family had even visited Connecticut, the mere presence of the Playtex corporate headquarters in Connecticut did not render this forum convenient. The defendants then asserted that, in light of their waiver of any jurisdictional claims that might otherwise be available to them in Canada, a trial located in British Columbia, Canada, would furnish an appropriate alternative forum for the plaintiffs' cause of action.

In advancing these claims, the defendants acknowledged that the Canadian forum might be less favorable than a Connecticut forum for the plaintiffs' pursuit of their cause of action. The defendants urged the trial court, however, to concentrate its attention upon the "constellations of hardships" that would befall the defendants should they have to defend the action in Connecticut. In particular, the defendants highlighted the difficulties they would allegedly encounter in mounting an affirmative defense, given that all sources

court's order subverts the goals of punishment and deterrence that underlie the assessment of punitive damages in Kansas." Id., 1450; see *Dow Chemical Co.* v. *Castro Alfaro,* 786 S.W.2d 674, 687 n.10 (Tex. 1990) (Doggett, J., concurring).

of proof with respect to the decedent's medical condition and care were beyond the compulsory process of a Connecticut court.[8]

The trial court undertook to weigh the competing private and public interest factors in accordance with the methodology suggested by *Gulf Oil Corporation* v. *Gilbert,* 330 U.S. 501, 507, 67 S. Ct. 839, 91 L. Ed. 1055 (1947), which this court recently characterized as a useful frame of reference for the law of Connecticut. *Union Carbide Corporation* v. *Aetna Casualty & Surety Co.,* 212 Conn. 311, 319, 562 A.2d 15 (1989). The court first determined the availability of British Columbia as an alternate forum. In doing so, the trial court rejected the plaintiffs' contentions that the procedural limitations on discovery, the denial of a jury trial and the substantive limits on recovery in cases of this nature rendered British Columbia an inadequate alternative. Thereafter, the court undertook to balance the relevant private and public interest factors to select the more appropriate forum.

In balancing the private interest factors, the trial court determined that the location of documentary evidence and the accessibility, in either forum, of those

[8] The defendants maintained before the trial court and renew on appeal their contention that the available medical records raise complex questions concerning both the diagnosis and etiology of the decedent's death. The defendants' identified expert, Vincent Spagna, an Ohio physician, attested in an affidavit accompanying the offer of proof of forum non conveniens that he "[could] not form an opinion within a reasonable degree of medical certainty as to the etiology of the decedent's final illness and the underlying cause of death." Moreover, the indication that a respirator used during the efforts to resuscitate the decedent may have malfunctioned, according to the defendants, provides additional justification for the attendance at trial of all the health care personnel who treated the decedent immediately prior to her death. Significantly, however, with respect to the alleged malfunction of the respirator, the trial court expressly found that the defendants had failed to indicate a sufficient factual basis for their claim that potentially liable Canadian third parties would have been impleaded, but for their preclusion in a Connecticut forum.

witnesses associated with product development were in equipoise,[9] but that the defendants would be significantly disadvantaged with regard to the accessibility of testimony concerning the decedent's medical condition and care were the case to be tried in Connecticut. On this basis, the court found that exceptional circumstances warranted dismissal for forum non conveniens.

Although this determination concerning the balance of the private interest factors would alone have warranted granting the defendants' motion to dismiss, the trial court proceeded as well to consider the public interest factors that might be at stake. The court emphasized that, because Canada regulates tampons as medical devices, Canada, as the locus of injury and the home forum of the plaintiffs, had a particularly strong interest in this product liability litigation. Moreover, unpersuaded by the plaintiffs' contention that Connecticut has a strong interest in deterring a native corporation from distributing a dangerously defective product into the stream of international commerce, the court further opined that, "[e]ven if it is assumed [that] the production and marketing decisions were made in Connecticut, which the parties dispute, Connecticut would still have a minimal interest . . . and should not impose its own view of the safety, warning, and duty of care required of medical devices upon a Canadian province." Finally, the trial court noted that, given Connecticut's "minimal interest" in this product lia-

---

[9] With respect to the accessibility, in either forum, of those witnesses involved in the development, manufacture and distribution of the Playtex super absorbent tampon, the trial court based its finding of equivalence upon the convenience of modern transportation and the representation of Playtex Family Products Corporation that it would make its employees available to the Canadian forum. It is clear, however, that a Connecticut forum was overall more accessible with respect to the evidence necessary to prosecute this product liability action.

bility litigation, choice of law principles favored the alternative forum because Canadian law should govern this litigation.

The trial court, apparently in recognition of the weight ordinarily to be accorded to the plaintiff's choice of forum, attached four conditions to its grant of the defendants' motion to dismiss. These conditions had previously been accepted by the defendants in a stipulation they had tendered in advance of the court's ruling. Given the possibility of jurisdictional disputes in the alternative forum as evidenced by the affidavits of the two Canadian legal experts,[10] the court required the defendants to submit to the jurisdiction of the Canadian court and to waive any statute of limitations defense not available at the time this lawsuit was filed in Connecticut. The court also required the defendants to consent to satisfy any judgment rendered against them in Canada. Furthermore, to alleviate any procedural deficiencies because the Canadian forum lacked compulsory process over foreign citizens, the trial court additionally ordered Playtex Family Products Corporation to make its employees available to testify in Canada.[11]

---

[10] We note with interest that, in view of the legal uncertainties of maintaining a cause of action in Canada, even the defendants' identified Canadian legal expert recommended, in an affidavit accompanying the motion to dismiss, "that the action in Connecticut be *stayed,* pending the outcome of the litigation in British Columbia, *rather than dismissed."* (Emphasis added.)

[11] As revealed at oral argument, discrepancies may arise as to the meaning of those conditions set forth by the trial court as requisites for a forum non conveniens dismissal. The principal difficulty with any condition attached by a trial court in dismissing a case for forum non conveniens lies in the enforcement. Once the trial court dismisses an action on the ground of forum non conveniens, its jurisdiction ceases. Although the concept of some sort of supervisory jurisdiction to ensure that its mandates are carried out in the alternative forum might theoretically provide some assurance to a trial court, we are not persuaded that the workability of such a concept of shared jurisdictions has been established in this case. See *In re Union Carbide Corporation Gas Plant Disaster at Bhopal,* 809 F.2d 195,

## I

Appellate review of the trial court's determination that Connecticut was an inconvenient forum for this product liability litigation must proceed from established principles of law. "As a common law matter, the doctrine of forum non conveniens vests discretion in the trial court to decide 'where trial will best serve the convenience of the parties and the ends of justice.' *Koster* v. *(American) Lumbermens Mutual Casualty Co.,* 330 U.S. 518, 527, 67 S. Ct. 828, 91 L. Ed. 1067 (1947); *Brown* v. *Brown,* [195 Conn. 98, 108–109 and n.17, 486 A.2d 1116 (1985)]." *Union Carbide Corporation* v. *Aetna Casualty & Surety Co.,* supra, 319. In our application of the abuse of discretion standard, we must accept the proposition that "simply to disagree with the [trial] court as if the facts had been presented to this court in the first instance cannot be the basis of our decision." *Lehman* v. *Humphrey Cayman, Ltd.,* 713 F.2d 339, 341 (8th Cir. 1983), cert. denied, 464 U.S. 1042, 104 S. Ct. 708, 79 L. Ed. 2d 172 (1984); *Paper Operations Consultants International, Ltd.* v. *SS Hong Kong Amber,* 513 F.2d 667, 670 (9th Cir. 1975). Meaningful review, even from this circumscribed perspective, nonetheless encompasses a determination whether the trial court abused its discretion as to either the facts or the law. *Irish National Ins. Co.* v. *Aer Lingus Teoranta,* 739 F.2d 90, 92 (2d Cir. 1984).

Emphasis on the trial court's discretion does not, however, overshadow the central principle of the forum non conveniens doctrine that *"unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."* (Emphasis added.) *Gulf Oil Corporation* v. *Gilbert,* supra, 508; *Manu Inter-*

205 (2d Cir.), cert. denied sub nom. *Executive Committee Members* v. *Union of India,* 484 U.S. 871, 108 S. Ct. 199, 98 L. Ed. 2d 150 (1987).

*national, S.A.* v. *Avon Products, Inc.,* 641 F.2d 62, 65 (2d Cir. 1981). Although it would be inappropriate to invoke "rigid rule to govern discretion"; *Piper Aircraft Co.* v. *Reyno,* 454 U.S. 235, 249, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981); it bears emphasis that invocation of the doctrine of forum non conveniens is a " 'drastic remedy' "; *Hemmelgarn* v. *Boeing Co.,* 106 Cal. App. 3d 576, 580, 165 Cal. Rptr. 190 (1980); which the trial court must approach with caution and restraint. The trial court does "not have unchecked discretion to dismiss cases from a plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff." *Pain* v. *United Technologies Corporation,* 637 F.2d 775, 783 (D.C. Cir. 1980), cert. denied, 454 U.S. 1128, 102 S. Ct. 980, 71 L. Ed. 2d 116 (1981). Although a trial court "applying the doctrine of forum non conveniens must walk a delicate line to avoid implicitly sanctioning forum-shopping by either litigant at the expense of the other"; id., 784; it cannot exercise its discretion in order to level the playing field between the parties. The plaintiff's choice of forum, which may well have been chosen precisely because it provides the plaintiff with certain procedural or substantive advantages, " 'should be respected unless equity weighs strongly in favor of the defendant.' " *Corrigan* v. *Bjork Shiley Corporation,* 182 Cal. App. 3d 166, 176, 227 Cal. Rptr. 247 (1986); see *Manu International S.A.* v. *Avon Products, Inc.,* supra, 65.

"[T]he overriding inquiry in a forum non conveniens motion is not whether some other forum might be a good one, or even a better one than the plaintiff's chosen forum. The question to be answered is whether [the] plaintiff's chosen forum is itself inappropriate or unfair because of the various private and public interest considerations involved." *Carlenstolpe* v. *Merck & Co.,* 638 F. Sup. 901, 909 (S.D.N.Y. 1986), appeal dismissed, 819 F.2d 33 (2d Cir. 1987). Accordingly, the trial court, in

exercising its structured discretion, should place its thumb firmly on the plaintiff's side of the scale, as a representation of the strong presumption in favor of the plaintiff's chosen forum, before attempting to balance the private and public interest factors relevant to a forum non conveniens motion.

When, as in the present action, the plaintiffs are foreign to their chosen forum, the trial court must readjust the downward pressure of its thumb, but not remove it altogether from the plaintiffs' side of the scale. Even though the plaintiffs' preference has a diminished impact because the plaintiffs are themselves strangers to their chosen forum; *Piper Aircraft Co.* v. *Reyno,* supra, 256; Connecticut continues to have a responsibility to those foreign plaintiffs who properly invoke the jurisdiction of this forum; see *Carlenstolpe* v. *Merck & Co.,* supra, 904; especially in the "somewhat unusual [situation where] it is the forum resident who seeks dismissal." *Schertenleib* v. *Traum,* 589 F.2d 1156, 1164 (2d Cir. 1978); *Manu International, S.A.* v. *Avon Products, Inc.,* supra, 67. Where a corporation is actually carrying on business in the state and the plaintiffs make an offer of proof concerning the defendant's in-state activities which supports the allegations that the tortious conduct occurred in the state, the corporate connection with the state is more than tenuous, and weighs against dismissal. See *Dow Chemical Co.* v. *Castro Alfaro,* 786 S.W.2d 674, 686, 688–89 (Tex. 1990) (Doggett, J., concurring). While the weight to be given to the choice of a domestic forum by foreign plaintiffs is diminished, their entitlement to a preference does not disappear entirely. The defendants challenging the propriety of this choice continue to bear "the burden to demonstrate why the presumption in favor of [the] plaintiff[s'] choice, weakened though it may be, should be disturbed." *Carlenstolpe* v. *Merck & Co.,* supra; *Ayers* v. *Arabian American Oil Co.,* 571 F. Sup.

707, 709 (S.D.N.Y. 1983); see also *Kontoulas* v. *A.H. Robins Co.*, 745 F.2d 312, 315–16 (4th Cir. 1984); *Manu International, S.A.* v. *Avon Products, Inc.*, supra, 66; cf. *Friends For All Children, Inc.* v. *Lockheed Aircraft Corporation*, 717 F.2d 602, 605 n.5 (D.C. Cir. 1983).

Continued deference, even in the case of foreign plaintiffs, to the presumption to be afforded a plaintiff's choice of forum, furthermore, is entirely consistent with our reasoning in *Union Carbide Corporation* v. *Aetna Casualty & Surety Co.*, supra, 318. We there upheld a trial court's determination that, despite the corporate presence of the plaintiff in this state, Connecticut was an inconvenient forum for a declaratory judgment action that involved toxic waste disposal activities at various sites throughout the country and in the Commonwealth of Puerto Rico. In *Union Carbide Corporation*, the plaintiff's withdrawal of its appeal had obvious significance for our review of the substantive merits of the remaining appellants' claim of abuse of discretion.[12] Id. When a plaintiff no longer voices a preference for the chosen forum, the presumption in favor of the plaintiff's choice has effectively eroded. Because, in *Union Carbide Corporation*, the plaintiff had chosen to level the playing field, our review of the trial court's exercise of its judicial discretion shifted in its focus, from an inquiry into whether the defendants there had sustained the heavy burden of persuasion that the plaintiff's choice of forum was inconvenient, to a more evenhanded inquiry into which alternative jurisdiction would furnish the more appropriate forum. Unlike *Union Carbide Corporation*, the

[12] In *Union Carbide Corporation* v. *Aetna Casualty & Surety Co.*, 212 Conn. 311, 318, 562 A.2d 15 (1989), the only plaintiff in the declaratory judgment action before the trial court was the Union Carbide Corporation. The remaining appellants in that appeal were counterclaimants below, who were aggrieved by the trial court's dismissal of their own independent actions.

selection of the more appropriate forum is not the proper inquiry in this case.

## II

The plaintiffs, as a threshold matter, contend on appeal that the trial court should not have found that British Columbia provided an adequate alternative forum for the litigation of their action. In challenging the trial court's finding, the plaintiffs rely on the concept of the "clearly unsatisfactory" forum as set forth in *Piper Aircraft Co.* v. *Reyno,* supra, 254 n.22.[13] The plaintiffs first take exception, given the difficulty in obtaining a sizeable recovery under the substantive law of British Columbia, to the trial court's determination that "[t]he potential award in British Columbia is not so paltry that no remedy exists." They also contend that, because the procedural limitations on discovery in British Columbia are of such magnitude as to eliminate the likelihood that the case will be tried, this court should entertain the novel proposition that differences

---

[13] Because the doctrine of forum non conveniens is not jurisdictional, any inquiry into its applicability "presupposes at least two forums in which the defendant[s] [are] amenable to process." *Gulf Oil Corporation* v. *Gilbert,* 330 U.S. 501, 506–507, 67 S. Ct. 839, 91 L. Ed. 1055 (1947). The court, as a threshold matter, must therefore decide whether an adequate alternative forum exists. *Piper Aircraft Co.* v. *Reyno,* 454 U.S. 235, 254 n.22, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981); *Union Carbide Corporation* v. *Aetna Casualty & Surety Co.,* 212 Conn. 311, 314, 562 A.2d 15 (1989). Ordinarily, the alternative forum prerequisite will be satisfied simply if the defendants are amenable to service in another jurisdiction. *Piper Aircraft Co.* v. *Reyno,* supra; *Gulf Oil Corporation* v. *Gilbert,* supra. The United States Supreme Court, however, has identified at least some instances in which mechanical inquiry into the amenability of process in the other forum must surrender to a more meaningful assessment of the *suitability* of the alternative forum. In *Piper Aircraft Co.* v. *Reyno,* supra, the United States Supreme Court noted that, in rare circumstances, where the remedy offered by the other forum is clearly unsatisfactory, such as where the alternative forum does not permit any litigation of the subject matter of the legal controversy, the other forum may not meet the threshold requirement of an adequate alternative.

in procedural law should be factored into the threshold inquiry of the adequacy of the alternative forum. For independent reasons, however, we do not reach this twofold question of whether British Columbia provided an adequate alternative forum.

## A

The plaintiffs first urge us to consider the monetary ceilings on any recovery they might obtain under the law of British Columbia as evidence of the legal inadequacy of that forum. Other courts have held that an alternative forum may be found, as a matter of law, to be inadequate when "the invocation of the doctrine [of forum non conveniens] will send the case to a jurisdiction which has imposed such severe monetary limitations on recovery as to eliminate the likelihood that the case will be tried"; *Irish National Ins. Co.* v. *Aer Lingus Teoranta,* supra, 91; *Piper Aircraft Co.* v. *Reyno,* supra; see *Dow Chemical Co.* v. *Castro Alfaro,* supra, 680, 682–83 (Doggett, J., concurring). We need not address that question here, however, because the choice of law problem may continue to be a viable issue regardless of the choice of forum. Whether this case is tried in Connecticut or in British Columbia, choice of law principles may well require the application of Canadian substantive law imposing monetary ceilings on recovery in products liability cases. We do not resolve that issue now. We hold only that, because any recovery by the plaintiffs in this forum may be limited to that amount permitted under the law of British Columbia, there is no occasion for us to consider in this instance whether such limited recovery precludes a forum non conveniens dismissal.

## B

Federal authorities generally limit the threshold inquiry of the adequacy of the alternate forum to those rare instances where the differences in substantive law

are so severe that the inadequate remedy provided by the alternative forum effectively precludes any remedy at all. The plaintiffs urge us, however, to expand the relevant inquiry to include as well significant differences in procedural law. The plaintiffs concede that the law of British Columbia recognizes product liability actions based in both tort and contract. They contend, nonetheless, that when the theory of liability is based on a design defect as in this instance, the procedural law of British Columbia, for all practical purposes, deprives them of a remedy.

The plaintiffs contend that such procedural restrictions as are found in British Columbia, given the complexities of a product liability action based on design defect, effectively preclude a meaningful opportunity to prove their case. In light of the defendants' disclosure in response to an interrogatory that "the number of individuals involved in the design of Playtex Super Plus tampons is large," the plaintiffs express particular concern with the rule of the court of British Columbia that only one representative of a corporate party may, as a matter of right, be examined for discovery.[14] Given the restrictive nature of Canadian pro-

[14] In addition to this numerical restriction, under the rules of the court of British Columbia, the corporate party retains the right to apply to the court to substitute another representative for that selected for examination by the party conducting discovery. Moreover, the effectiveness of any cross-examination may be limited by the continual interruptions necessitated so that the corporate representative might inform himself or herself from other persons with the corporation. Finally, discovery through nonparty witnesses, such as former employees of International Playtex, Inc., is severely restricted not only because of the lack of compulsory process but due to the inherent limitation on the availability of pretrial depositions of nonparty witnesses. Although the defendants maintain on appeal that the question of the necessity of former Playtex employees, who may have information relevant to the subject matter of this product liability action, was never brought to the trial court's attention, our examination of the record reveals in fact that it was the defendants themselves who first raised this potential problem in response to the plaintiffs' interrogatories and requests for production.

cedural law, the plaintiffs argue that any inquiry into the adequacy of British Columbia as an alternative forum must necessarily take on a "Kafkaesque quality—everyone knows that no witnesses will ever be called to testify." *Irish National Ins. Co.* v. *Aer Lingus Teoranta,* supra, 91; see *Dow Chemical Co.* v. *Castro Alfaro,* supra, 680, 682–83 (Doggett, J., concurring).

Because the burden of production and persuasion in their products liability case necessarily rests with them, the plaintiffs maintain that it is only fitting that they be afforded the substantive benefits of our procedural rules. In support of their proposition that the implied distinction drawn by the United States Supreme Court in *Piper Aircraft Co.* v. *Reyno,* supra, 254 n.22, between substantive and procedural law elevates form over substance,[15] the plaintiffs proffer as instructive the developments by lower federal courts that give consideration "to *procedural differences* which do in fact correlate to *material inconveniences.*" (Emphasis added.) *Rudetsky* v. *O'Dowd,* 660 F. Sup. 341, 346 (E.D.N.Y. 1987). The plaintiffs assert that lower federal courts have, in fact, expanded the scope of consideration, in weighing the balance of private and public interests, to give consideration "to the realities of the plaintiff's position, financial and otherwise, and his or her ability as a practical matter to bring suit in the alternative forum." *Lehman* v. *Humphrey Cayman, Ltd.,* supra, 346; see *Irish National Ins. Co.* v. *Aer Lingus Teoranta,* supra, 91; *Manu International, S.A.* v. *Avon Products, Inc.,* supra, 67; *Rudetsky* v. *O'Dowd,* supra; *Hodson* v. *A.H. Robins Co.,* 528 F. Sup. 809, 818 (E.D. Va. 1981), aff'd, 715 F.2d 142 (4th Cir. 1983).

---

[15] The plaintiffs also note that "elements of procedure express social and political values concurrent with those expressed in substantive legal rules and deemed worthy independently of what the substantive law may be." F. James & G. Hazard, Civil Procedure (3d Ed.) § 1.1, p. 2.

We agree that the rules of discovery, by facilitating an intensive search for the truth through accuracy and fairness, provide procedural mechanisms designed to make a "trial less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent." *United States* v. *Proctor & Gamble Co.*, 356 U.S. 677, 682, 78 S. Ct. 983, 2 L. Ed. 2d 1077 (1958); see *Pool* v. *Bell*, 209 Conn. 536, 541, 551 A.2d 1254 (1989); *Sturdivant* v. *Yale-New Haven Hospital*, 2 Conn. App. 103, 106, 476 A.2d 1074 (1984); K. Sinclair, Federal Civil Practice (2d Ed.) §§ 9.03 through 9.10. Moreover, a liberal interpretation of discovery rules is particularly desirable in products liability cases; *Hudock* v. *Gra-Rock Gingerale Co.*, 32 Conn. Sup. 94, 96, 340 A.2d 193 (1975); because of the complex nature of the considerable proof required in order successfully to maintain this type of action.

We need not, however, resolve in this instance whether differences in procedural law should, like differences in the substantive law, be factored into the threshold inquiry of the adequacy of the alternative forum. Even if we assume that the trial court correctly determined that British Columbia was an adequate alternate forum, as a threshold matter, the court's judgment of dismissal can only be sustained if it properly balanced the advantages offered by the two alternatives. We turn to that question now.

### III

The principal ground for the plaintiffs' claim of abuse of discretion in this case is their assertion that the trial court lacked a firm evidentiary basis for its conclusion that the balance of private interest factors shifted sufficiently in favor of the defendants to warrant a forum non conveniens dismissal. Underlying this claim of evidentiary insufficiency lies the plaintiffs' allegation

that the trial court, in emphasizing the hardship to the defendants that might ensue from a trial in Connecticut, improperly sought to level the playing field between the parties, instead of giving due weight to the plaintiffs' choice of forum. The plaintiffs maintain that the trial court, in balancing the comparative advantages of each of the alternative fora, wrongly shifted the burden of persuasion onto the plaintiffs. We agree with the plaintiffs' contentions.

## A

The trial court granted the defendants' motion to dismiss in large measure because it accepted their contention that a Connecticut forum would seriously inconvenience their access to the damage evidence, particularly to the testimony concerning the decedent's medical condition and care, all of which evidence is located in British Columbia. The defendants, however, bore the burden of persuasion that the chosen forum is inconvenient to potential witnesses for the defense. *Lacey* v. *Cessna Aircraft Co.,* 862 F.2d 38, 43–44 (3d Cir. 1988). When a dismissal is premised on the convenience of witnesses, more than a mere allegation to that effect is required. *Piper Aircraft Co.* v. *Reyno,* supra, 259 and n.27. "Rather, the defendant[s] must establish, with specificity, inconvenience to witnesses that is sufficiently prejudicial to justify dismissal." *Mowrey* v. *Johnson & Johnson,* 524 F. Sup. 771, 775 (W.D. Pa. 1981). "A party seeking to transfer a case . . . for the convenience of witnesses must identify the key witnesses to be called and must make a general statement of what their testimony will cover. *Jenkins* v. *Wilson Freight Forwarding Co.,* 104 F. Supp. 422, 424 (S.D.N.Y. 1952). The burden is upon it to give the names and locations of potential witnesses and the substance of their testimony. *National Super Spuds* v. *New York Mercantile Exchange,* 425 F. Supp. 665, 668 (S.D.N.Y. 1977). Sufficient information must

be included in the affidavits to establish that the named witnesses are key witnesses who need to be called and that their testimony is material." *Alcoa Steamship Co. v. M/V Nordic Regent,* 654 F.2d 147, 167 (Van Graafeiland, J., dissenting), rev'd on rehearing, 169 (2d Cir. 1981). The mere assertion that such evidence is irretrievably located in Canada is, therefore, not adequate to tip the scales in the defendants' favor on a motion to dismiss for forum non conveniens. See *Carlenstolpe* v. *Merck & Co.,* supra, 907.

The evidentiary submission in support of the defendants' contention was limited, in this case, to one affidavit from a physician who was unable, after review of the available medical documents, conclusively to determine whether toxic shock syndrome was the cause of the decedent's death. With respect to the medical personnel who actually attended the decedent, the defendants submitted no affidavits whatsoever regarding their unavailability despite the defendants' assertion that these medical witnesses could offer evidence material to the presentation of a defense concerning the decedent's medical condition and the quality of care. The defendants relied instead on their dissatisfaction with affidavits of availability, voluntarily submitted by the plaintiffs, from two of the decedent's treating physicians and the pathologist who conducted her autopsy.[16]

The trial court, instead of drawing an adverse inference from the *defendants'* failure to provide the requisite affidavits supporting their claim of hardship

---

[16] The defendants maintain on appeal that the doctors' affidavits, attesting to their willingness to testify in Connecticut if necessary, are not unequivocal. While the affidavits do indeed premise the doctors' availability to this forum on the plaintiffs' willingness adequately to compensate them for their services, we draw no adverse inferences from this acceptable equivocation, as the availability of expert testimony is generally dependent upon compensation for that service.

generated by the lack of compulsory process for foreign witnesses in Connecticut, impermissibly penalized the *plaintiffs* for failing to provide affidavits from other treating physicians as well as other medical personnel who attended the decedent at the time of her death. That conclusion stands the applicable burden of proof on its head and totally removes from the balancing process the preference to which the plaintiffs' choice of forum is entitled. The defendants cannot meet their own evidentiary burden by pointing to alleged deficiencies in affidavits that the plaintiffs had no obligation to provide.

The trial court therefore lacked the proper evidentiary basis for its finding that "[c]ertainly to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants"; *Gulf Oil Corporation* v. *Gilbert,* supra, 511. The court furthermore lost sight of modern technological innovations since the United States Supreme Court issued its decision in *Gilbert* in 1947. Just as " '[j]et travel and satellite communications have significantly altered the meaning of "non conveniens" ' "; *Manu International, S.A.* v. *Avon Products, Inc.,* supra, 65, quoting *Calavo Growers of California* v. *Belgium,* 632 F.2d 963, 969 (2d Cir. 1980) (Newman, J., concurring), cert. denied, 449 U.S. 1084, 101 S. Ct. 871, 66 L. Ed. 2d 809 (1981); see *Dow Chemical Co.* v. *Castro Alfaro,* supra, 708 (Hecht, J., dissenting), and 684 (Doggett, J., concurring); so too has the advent of the videotaped deposition greatly transformed the meaning of "compulsory process" in a forum non conveniens calculus. "[V]ideotaped depositions frequently make corporeal transportation of foreign witnesses unnecessary." *Rudetsky* v. *O'Dowd,* supra, 347–48. We conclude, therefore, that the trial court abused its discretion when it found that the pri-

vate interest factors weighed in favor of the defendants sufficiently to overcome the presumption afforded the plaintiffs' chosen forum.

### B

Despite the trial court's primary emphasis on balancing the private interest factors in this case, the court buttressed its conclusion that dismissal was warranted by also finding that certain public interest factors supported a Canadian rather than a Connecticut forum. We are not persuaded that, standing alone, these factors support the trial court's exercise of its discretion in the defendants' favor.

With respect to the public interest factors identified by the trial court, we note that it is well established that considerations arising out of conflicts of law are not dispositive for the purpose of dismissals for forum non conveniens. *Lehman v. Humphrey Cayman, Ltd.*, supra, 345; *Manu International, S.A. v. Avon Products, Inc.*, supra, 67–68. "[T]he mere fact that the court is called upon to determine and apply foreign law does not present a legal problem of the sort which would justify the dismissal of a case otherwise properly before [it]." *Hoffman v. Goberman*, 420 F.2d 423, 427 (3d Cir. 1970). Connecticut courts are quite capable of applying foreign law when required to do so and it would be improper to invoke the doctrine of forum non conveniens solely to avoid a choice of law analysis. See *Rudetsky v. O'Dowd*, supra, 348.

Furthermore, the fact that this product liability action arose in a foreign nation, and involved a regulated industry, does not in and of itself establish the applicability of the law of the foreign nation. See *Piper Aircraft Co. v. Reyno*, supra, 243; *Carlenstolpe v. Merck & Co.*, supra, 908–909; *Lake v. Richardson-Merrell, Inc.*, 538 F. Sup. 262, 274–75 (N.D. Ohio 1982), motion denied sub nom. *Haddad v. Richardson-Merrell, Inc.*,

588 F. Sup. 1158 (N.D. Ohio 1984); cf. *Dowling* v. *Richardson-Merrell, Inc.,* 727 F.2d 608, 615 (6th Cir. 1984); *Harrison* v. *Wyeth Laboratories,* 510 F. Sup. 1, 4–5 (E.D. Pa. 1980), aff'd, 676 F.2d 685 (3d Cir. 1982). The situs of manufacture is not necessarily controlling in assessing the relative public interest involved when the real issue is "not some alleged manufacturing defect but rather the adequacy of the . . . design and testing, and of the basic information package supplied by its creator . . . ." *Carlenstolpe* v. *Merck & Co.,* supra, 908; see *Lake* v. *Richardson-Merrell, Inc.,* supra; see *Dow Chemical Co.* v. *Castro Alfaro,* supra 686, 688–89 (Doggett, J., concurring). Even if the law of British Columbia is to be applied, the myriad contacts between this jurisdiction and the Canadian version of the super absorbent tampon implicated in the decedent's death refute the trial court's finding that this forum has a "minimal interest" or connection to this dispute. We therefore conclude that the defendants have not established so clear a balance of public interests in favor of a Canadian forum as to justify an override of the plaintiffs' choice of Connecticut as their preferred forum.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion CALLAHAN, GLASS and HULL, Js., concurred.

SHEA, J., dissenting. As the majority recognizes, "the doctrine of forum non conveniens vests discretion in the trial court to decide 'where trial will best serve the convenience of the parties and the ends of justice.' " *Union Carbide Corporation* v. *Aetna Casualty & Surety Co.,* 212 Conn. 311, 319, 562 A.2d 15 (1989). "It bears emphasis, however, that these guidelines begin with the proposition that the trial court's exercise

of its discretion may be reversed only upon a showing of clear abuse." Id.

The majority purports to have found such an abuse of discretion in agreeing with the contention of the plaintiffs "that the trial court, in balancing the comparative advantages of each of the alternative fora, wrongly shifted the burden of persuasion onto the plaintiffs." This view, however, ignores the several references in the memorandum of decision to the presumption in favor of the plaintiffs, such as the adoption of this quotation from *Gulf Oil Corporation* v. *Gilbert,* 330 U.S. 501, 508, 67 S. Ct. 839, 91 L. Ed. 1055 (1947): "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." In summarizing its analysis, the court expressly referred to the presumption: "The inconvenience and burdens of a trial in Connecticut strongly overcome the presumption in favor of the plaintiffs' preferred forum."

The majority holds, nevertheless, that the conclusion of the court that several witnesses who attended the decedent are not amenable to compulsory process in Connecticut is somehow flawed by the failure of the defendants to furnish affidavits summarizing their testimony and attesting to their unavailability. There cannot be any dispute, however, over the inability of the defendants to bring these witnesses to Connecticut by compulsory process. There was a sufficient basis in the undisputed facts to support the trial court's discussion of this subject as follows: "The defendants point out that all sources of proof concerning the decedent's use of the product, her illness, her medical history, and her treatment are in British Columbia. At least two doctors whom the plaintiffs did not name as willing to come to Connecticut were involved in the care of Linda Ann Picketts at Penticton Hospital in British Columbia. Nurses and other persons in British Columbia may also

have information relative to the cause of death. For example, there is an indication that a respirator used during efforts to resuscitate Linda Ann Picketts may have malfunctioned. All these witnesses are beyond the compulsory process of this forum. 'Certainly to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants.' *Gulf Oil Corporation* v. *Gilbert,* supra, 511."

It is an unfounded distortion for the majority to infer from this reasoned analysis that the trial court "impermissibly penalized the *plaintiffs* for failing to provide affidavits from other treating physicians as well as other medical personnel" and thus stood "the applicable burden of proof on its head." (Emphasis in original.)

The majority refers also to the advent of such modern technological innovations as jet travel and video-taped depositions as diminishing the force of the doctrine of forum non conveniens, but does not purport to abrogate the doctrine. The availability of air travel undoubtedly facilitates the ability to bring witnesses to court from distant locations, assuming those witnesses are willing to come. Even when such witnesses do appear to testify, however, the payment of their expenses, aside from the financial burden imposed, may often be the subject of cross-examination designed to suggest to a jury partiality or interest on their part as compared to those witnesses who have been subpoenaed. The videotaped deposition, similarly, is not a wholly satisfactory answer to the concern of the trial court over lack of compulsory process. Experienced trial lawyers recognize that the impact of such testimony cannot compare with that of a live witness. Because such testimony is ordinarily obtained before trial, it frequently does not cover significant aspects of a case that develop during a trial.

The majority also appears to challenge the trial court's assessment of the public interest factors as favoring a trial in British Columbia. The memorandum of decision refers to the fact that the decedent was a life-long resident of Canada, that all medical treatment was rendered in Canada, that the product was manufactured in Canada by a Canadian corporation and that the manufacture, caution labels and distribution of the product were regulated by the Canadian government. These circumstances, the court concluded, as compared with Connecticut's interest as the site of the corporate headquarters of the defendant, where the product was designed, weighed heavily in favor of a Canadian forum. The court also mentioned "the advantages in having the trial in a forum which is at home with the law which must govern the case" and that "Connecticut should not impose its own view of the safety, warning, and duty of care required of medical devices upon a Canadian province."

The majority seems to question the applicability of British Columbia substantive law as a factor supporting the trial court's conclusion that the interest of Connecticut in this litigation was "minimal" by comparison. That question is left hanging, however, to be faced by some unfortunate trial judge. If our law is uncertain in this respect, that circumstance alone would militate strongly in favor of British Columbia as a forum. "The doctrine of forum non conveniens . . . is designed in part to help courts avoid conducting complex exercises in comparative law." *Piper Aircraft Co.* v. *Reyno,* 454 U.S. 235, 251, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981).

" 'Wisely it has not been attempted to catalogue the circumstances which will justify or require either grant or denial of [the] remedy [of dismissal for forum non conveniens]. The doctrine leaves much to the discretion of the court to which [the] plaintiff resorts, and experience has not shown a judicial tendency to

renounce one's own jurisdiction so strong as to result in many abuses.' " *Union Carbide Corporation* v. *Aetna Casualty & Surety Co.,* supra, 322, quoting *Gulf Oil Corporation* v. *Gilbert,* supra, 508. In reviewing this exercise of judicial discretion with such a heavy hand, the majority usurps the function of the trial court and fails to accord reasonable deference to its evaluation of the factors involved.

Accordingly, I dissent.