DENISE M. ORSI ET AL. *v.* ROSE A. SENATORE, COMMISSIONER OF CHILDREN AND YOUTH SERVICES
(10363)

FOTI, LAVERY and LANDAU, Js.

Argued October 8 and 9, 1992—decision released April 29, 1993

*Susan K. Smith,* with whom, on the brief, was *Hope C. Seely,* for the appellant (plaintiff).

*Linda Pearce Prestley,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Carolyn K. Querijero* and *Susan T. Pearlman,* assistant attorneys general, for the appellee (defendant).

FOTI, J. This is an appeal from the judgment of the trial court in effect dismissing the third count of the plaintiffs' complaint, which sought a declaratory judgment. The court denied relief under that count because it found that the named plaintiff, Denise M. Orsi, lacked standing. We reverse the judgment and grant the requested declaratory relief.

The complaint was brought against the commissioner of the department of children and youth services (commissioner or DCYS) following the commissioner's proposed removal of Christopher C. from foster care. Our review of the complete record reveals the following facts and procedural history.

Christopher was born at Bristol Hospital on February 12, 1989, to a single, fifteen year old mother, Deborah C. At birth, Christopher had respiratory problems requiring surgery. He spent his first several months of life hospitalized at the University of Connecticut Health Center. Shortly after his discharge, he was rehospitalized because his mother had over suctioned him and he was bleeding from the area of his tracheostomy. DCYS thereupon applied for an order of temporary custody, which was granted in May, 1989. At the time, Deborah C. and Stephen P., Christopher's father, admitted to allegations of homelessness and neglect. The Superior Court at Plainville issued a protective supervision order on May 31, 1989, to ensure that Christopher would have an appropriate and safe living environment. The court granted partial custody of Christopher to Barbara R., his maternal grandmother. Attorney Stephen L. Mangan was appointed to represent Christopher at these proceedings.

Following his second discharge from the hospital in June, 1989, Christopher was released to the care of Deborah C. and Barbara R., with whom Deborah then resided. Between June and September, 1989, a private

duty nurse provided services to assist with Christopher's routine and special medical needs. Protective supervision by DCYS ended in early December, 1989. Shortly thereafter, however, Barbara R. complained to DCYS of the violent relationship between Christopher's parents. At the request of DCYS, "Homebuilders" (Klingberg Family Protective Services) worked with Deborah C. and Barbara R. to keep Christopher in his grandmother's home and to prevent his placement in foster care. In early March, 1990, however, the relationship between Deborah C. and Barbara R. became strained, and Barbara forced Deborah, then pregnant with her second child by Stephen P., and thirteen month old Christopher to leave her home. Deborah C. then voluntarily placed Christopher in foster care and DCYS appointed Denise M. Orsi and her husband to be the child's foster parents. The child made excellent developmental progress and responded well to the stability and nurturing provided by his foster family.

Over the next months, DCYS provided an array of family services in an effort to reunite Christopher and his mother.[1] Deborah C. was referred to Casey Family Services (Casey), which provided in-home services including parent education and support, clinical counseling, respite and homemaking assistance, and transportation. During this period, Christopher was allowed to visit Deborah C., who then resided with Stephen P.'s parents. At one point, however, a relative of the child complained to DCYS that Stephen P. was abusive toward Christopher during these visits. Stephen P. had also had an altercation with Deborah C. that resulted in his arrest in June, 1990.

In August, 1990, DCYS again sought an order of temporary custody, which was granted by the Juvenile Court on October 3, 1990. The bases for the order were

---

[1] No reunification efforts were directed to Stephen P.

that Christopher was neglected, in that he was being permitted to live under conditions injurious to his well-being, and that he was uncared for, in that he was homeless. Concern arose over the child's safety on unsupervised weekend visits, due to reports of family violence. In December, 1990, a DCYS social worker prepared a report recommending that Christopher be committed to the custody of DCYS for eighteen months in view of ongoing concerns involving Stephen P.'s violent temper tantrums and abusive behavior.[2] A court-ordered psychological evaluation concluded that neither Deborah C. nor Stephen P. was capable of taking care of Christopher.

In January, 1991, the trial court found Christopher to be uncared for and neglected, and committed him to the custody and guardianship of DCYS for the statutory period of eighteen months, pursuant to General Statutes § 46b-129 (d).[3] Christopher continued in the

---

[2] The report states: "The Department of Children and Youth Services does not feel that Christopher's need for a safe, nurturing environment can be met in his mother's home at this time due to Stephen [P.'s] abuse of Deborah, his violent temper and poor judgment which seriously jeopardizes Christopher's welfare and places him at great risk. Deborah [C.] continues to require assistance to improve her parenting skills and address her individual issues before she can adequately meet Christopher's needs. Her focus on her relationship with Stephen [P.] jeopardizes Christopher's safety and well-being."

[3] General Statutes § 46b-129 (d) provides: "Upon finding and adjudging that any child or youth is uncared-for, neglected or dependent, the court may commit him to the commissioner of children and youth services for a maximum period of eighteen months, unless such period is extended in accordance with the provisions of subsection (e) of this section, provided such commitment or any extension thereof may be revoked or parental rights terminated at any time by the court, or the court may vest such child's or youth's care and personal custody in any private or public agency which is permitted by law to care for neglected, uncared-for or dependent children or youth or with any person found to be suitable and worthy of such responsibility by the court. The commissioner shall be the guardian of such child or youth for the duration of the commitment, provided the child or youth has not reached the age of eighteen years or, in the case of a child or youth in full-time attendance in a secondary school, a technical school,

care of the Orsis, and Deborah C. was permitted only strictly supervised visits with him. Stephen P. was not permitted to visit the child. Shortly thereafter, Barbara R. expressed interest in providing a home for her grandson. DCYS and Casey both supported this arrangement. Denise Orsi, who objected to this plan because of her fears for the child's safety, succeeded in having DCYS delay the removal, to allow for an easier transition for Christopher.

In April, 1991, Casey family counselors notified Orsi that Christopher would be removed from the foster home and placed in the care of Barbara R. Concerned that the proposed placement would not be in Christopher's best interests, Orsi immediately filed suit in the Superior Court for the judical district of Hartford-New Britain at Hartford on May 3, 1991. Orsi's concern centered on the fact that while his grandmother would be at work, Christopher would be cared for by Barbara R.'s brother-in-law, who lived a few

a college or a state-accredited job training program, provided such child or youth has not reached the age of twenty-one, by consent of such youth, or until another guardian has been legally appointed, and in like manner, upon such vesting of his care, such other public or private agency or individual shall be the guardian of such child or youth until he has reached the age of eighteen years or, in the case of a child or youth in full-time attendance in a secondary school, a technical school, a college or a state-accredited job training program, until such child or youth has reached the age of twenty-one years or until another guardian has been legally appointed. Said commissioner may place any child or youth so committed to him in a suitable foster home or in the home of a person related by blood to such child or youth or in a licensed child-caring institution or in the care and custody of any accredited, licensed or approved child-caring agency, within or without the state, provided a child shall not be placed outside the state except for good cause and unless the parents of such child are notified in advance of such placement and given an opportunity to be heard, or in a receiving home maintained and operated by the commissioner of children and youth services. In placing such child or youth, said commissioner shall, if possible, select a home, agency, institution or person of like religious faith to that of a parent of such child or youth, if such faith is known or may be ascertained by reasonable inquiry, provided such home conforms to the standards of said commissioner."

houses away from Barbara; Deborah C., then seventeen and pregnant with her third child by Stephen P., was living in her own apartment in the brother-in-law's house. In her complaint, Orsi alleged that there would be no way for DCYS to prevent Christopher's parents from participating in his care, and, thus, the proposed placement was tantamount to returning the child to the environment from which he had earlier been removed.

Orsi's three count complaint contained an application for a writ of habeas corpus pursuant to General Statutes § 52-466 (f),[4] which explicitly confers standing upon foster parents to challenge a removal action by DCYS. The complaint also sought an injunction prohibiting the removal of Christopher by DCYS until it could be determined whether the removal was in his best interests, and a declaratory ruling on the constitutionality of § 17-37-4 (c) of the Regulations of Connecticut State Agencies, which forecloses foster parents from an administrative hearing when a child is removed from their home and returned to a family member.[5] The

[4] General Statutes § 52-466 (f) provides: "A foster parent or an approved adoptive parent shall have standing to make application for a writ of habeas corpus regarding the custody of a child currently or recently in his care for a continuous period of not less than ninety days in the case of a child under three years of age at the time of such application and not less than one hundred eighty days in the case of any other child."

[5] Section 17-37-4 of the Regulations of Connecticut State Agencies provides: "HEARING PROCEDURES

"(a) RIGHT TO A REMOVAL HEARING

"(1) An approved or licensed foster parent may request a Removal Hearing if the child has been in continuous placement in the foster home for one year or more. Exception: The one year requirement shall not apply in cases where the foster parent is a relative.

"(2) Except in cases of imminent danger, the department shall notify the foster parent in writing at least 10 days before removal of its decision to remove the child from the foster home and of the foster parent's right to a removal hearing if he or she disagrees with the plan.

"The case record shall contain dated documentation of (a) the foster parent's reaction to the child's removal, (b) whether or not the foster parent wishes to exercise the right to ask for a Removal Hearing, and (c) a copy

thrust of this third claim was that the challenged regulation is unconstitutional on its face because it "denies a child notice and opportunity to be heard" when DCYS determines that a back-to-family placement should be made. Orsi's complaint indicated explicitly that she did

of the letter sent to the foster parent regarding removal. If the foster parent decides to request a Removal Hearing, the social worker will provide any assistance necessary.

"(3) The child will remain in the foster home pending the outcome of a Removal Hearing. Exception: If the child is in imminent danger, the department may take appropriate action to protect the child. A Probable Cause Hearing in this situation will be scheduled within 10 working days of a request, and a Removal Hearing will be scheduled upon completion of a third party and/or police investigation of the foster home. Notice of the right to a Probable Cause Hearing shall be given at time of the removal. If the foster parent desires a Probable Cause Hearing, she must notify the department by mailing a written request within 48 hours.

"(4) The written notice given to the foster parent pursuant to 17- 37-4 (2) and (3), shall cite this regulation, state the department's reason for removal, the foster parents right to a Removal Hearing, the manner in which the request for a hearing must be made, and the time within which request must be made or waived.

"(b) REQUEST FOR REMOVAL HEARING

"(1) The foster parent may request a Removal Hearing by sending a letter to the Commissioner stating the reasons why the child should not be removed. The letter must be received within 10 calendar days from the date on which the department notified the foster parent of the decision to remove the child from the foster home or removed the child from the home in cases of emergency as defined in 17-34-3 (3).

"(2) Responsibility for preparing the foster parent and the child for the Removal Hearing shall be shared by the regional office, the hearing unit and the child's advocate. The regional staff explains the Removal Hearing process and may use the hearings unit as a resource for additional information. The child's advocate may also provide factual information pertaining to Removal Hearing procedures as well as provide reassurance and emotional support.

"(c) DENIAL OF REQUEST FOR A REMOVAL HEARING

"A Removal Hearing will be denied by the hearings unit when:

"(1) The child is being placed directly with the parent, parents, legal guardian, or other relative.

"(2) The child is not in the custody of the department pursuant to any court order.

"(3) Court proceedings are in progress which can affect custody, or a court decision such as a revocation of commitment results in moving the

not seek custody of Christopher for herself or her husband, but rather that she sought to enforce the child's own state and federal constitutional rights against arbitrary determinations of his best interests.

child from the foster home.

"(4) The foster home is not approved or licensed by the Department.

"(d) ROLES AND RESPONSIBILITIES OF PARTICIPANTS

"(1) The Panel:

"(A) The Removal Hearing is conducted by a three person panel appointed by the Commissioner. Two members will come from outside DCYS and will be knowledgeable in the child welfare field. The third will be a department social worker or supervisor working in direct supervision of children in foster care or foster care licensing. The panel chairman shall be one of the outside professionals. The probable cause hearing is conducted by one person, either a professional from outside the department knowledgeable in the child welfare field or a DCYS hearing officer.

"(B) A current list of qualified persons designated by the Commissioner is maintained by the hearings unit. With the exception of the chairman, the hearings unit rotates appointments and gives consideration to ethnic balance, diversity of expertise, and availability.

"(C) The panel members will attend all proceedings pertaining to the Removal Hearing.

"(D) At no time shall the panel include members of the same outside agency or regional office where the child or foster parent is being counseled or supervised or any other person with knowledge of the case.

"(E) The chairman shall have overall administrative responsibility for conducting the Removal Hearing. The chairman will:

"(i) instruct the other panel members on procedures prior to hearing.

"(ii) ensure that the hearing is conducted in an orderly manner.

"(iii) afford all parties the opportunity to present information fully.

"(iv) permit parties to question each other when it is appropriate to do so.

"(2) The Child's Advocate

"(A) The department shall designate a private social service agency or qualified professional outside the department to serve as the child's advocate during the Removal Hearing. The advocate shall gather pertinent case data through appropriate interviews and review of records to provide the panel with the required background information and to make recommendations at the hearing.

"(B) The advocate shall not be a person who is involved in any decisions about the case such as an abuse referral or an adoption study.

"(C) The advocate is permitted to share information with private consultants if consultation services are approved by the department.

"(3) The Foster Parent:

"The foster parent requesting the Removal Hearing, shall be permitted to bring an attorney or other representative, witnesses and consultants,

On May 6, 1991, the trial court, *Maloney, J.,* entered an ex parte order temporarily enjoining DCYS from removing Christopher from Orsi's care. On May 20,

at his expense. He may also bring reports, letters and other documents to support his position. The foster parent is encouraged to participate freely.

"(4) The Attorney or Representative

"The Removal Hearing will be held in accordance with the Connecticut Uniform Administrative Procedure Act—Connecticut General Statute 4-177 through 4-183 inclusive. However, it is conducted on an informal basis to promote openness and discussion of issues that will help the panel arrive at the best decision for the child. An adversarial atmosphere focused more on procedure and restriction of information is contrary to the purpose of the Removal Hearing.

"(5) The Child:

"As a matter of policy, the child will participate in the hearing to the extent possible.

"(6) The Regional Office Representatives:

"(A) The department shall be represented by the regional office social worker for the child and the supervisor or program supervisor involved in the decision to remove the child.

"(B) The regional office staff shall come fully prepared to discuss the decision to remove the child and the rationale upon which it is based.

"(C) A summary of facts shall be prepared by the regional office representative outlining clearly and briefly all the reasons for the child's removal. The summary shall be submitted to the hearings unit immediately following the hearing requests, and a copy will be sent to the foster parents, their attorney, and the child's advocate with the notice of hearing. The purpose of the summary is to focus the hearing by setting forth the issues to be considered and enable the foster parents to respond.

"(7) Witnesses:

"(A) Department administrators, licensing, adoption and other staff may be present to testify if it is deemed appropriate, but generally do not remain during the entire hearing.

"(B) Other witnesses shall be called to testify at the appropriate times and will not remain during the entire hearing.

"(8) Case Records:

"(A) The child's advocate shall have immediate and unlimited access to all department records and documents pertaining to the child and the foster parents.

"(B) Prior to and during the hearing, the foster parents and their attorney shall have access to their foster care record upon request.

"(C) Prior to and during the hearing, the foster parents or their attorney for purposes of the hearing may inspect their portion of the child's record, if any, which pertains to the extent and quality of the care given to the child in that foster home."

1991, the court, *O'Neill, J.,* entered an order granting a motion by DCYS to transfer the case to "the Superior Court for Juvenile Matters at Plainville," which had entered the original neglect finding. The trial court also granted the motion to intervene filed by attorney Stephen L. Mangan, who had represented Christopher at the neglect proceedings and had been appointed his counsel and guardian ad litem.[6]

On May 28, 1991, Orsi filed an amended complaint to make it clear that she was bringing the declaratory judgment portion of the complaint on behalf of Christopher, as his prochein ami or next friend. Despite Judge O'Neill's ruling that Mangan was counsel and guardian ad litem for Christopher, Orsi continued to maintain that she represented him.

On June 5, 1991, after the transfer to Superior Court at Plainville, DCYS filed a motion to strike the next friend allegations of the complaint, on the ground that Orsi could not serve as Christopher's next friend. The court, *Brenneman, J.,* ruled on this motion immediately, despite objection by Orsi's counsel, and determined that Orsi lacked standing as next friend. This ruling, dated June 5, 1991, effectively struck the declaratory judgment portion of the complaint. On June 20, 1991, the trial court dissolved the temporary injunction that had been entered by Judge Maloney and also ruled against Orsi on the habeas count of the petition. The court found that Orsi had failed to establish that the return of Christopher to the care of Barbara R. was not in his best interests. Orsi has not appealed from that decision.

Christopher was immediately removed from the Orsi home and placed with his grandmother, Barbara R. He remains committed to the custody of DCYS.

---

[6] The trial court, upon granting Mangan's motion to intervene, stated that Orsi's counsel represented only Orsi, herself, but not Christopher.

Orsi, denominated "Denise M. Orsi, P.P.A. 'Baby Doe,' " filed a timely appeal from the trial court's rulings as to the declaratory judgment. On June 7, 1991, the plaintiff moved for articulation of the trial court's June 5 oral denial of the declaratory judgment action; the motion was renewed on November 14, 1991, and the articulation was filed by the court on January 21, 1992.

On appeal, Orsi claims that the trial court improperly (1) denied the declaratory judgment count of the complaint, (2) denied the declaratory judgment count, sua sponte, without holding judicial proceedings on the matter, (3) denied Orsi the right to conduct discovery relative to the declaratory judgment count, (4) granted the commissioner's motion to strike Orsi's designation as next friend of Christopher, and (5) granted the commissioner's motion to strike on the day it was filed, in violation of Practice Book § 152. The commissioner, in addition to disputing Orsi's five claims, argues that this court lacks subject matter jurisdiction over the appeal because the claims are moot.[7]

---

[7] On August 7, 1991, the commissioner moved to dismiss this appeal on grounds that Denise Orsi lacked standing to bring the appeal and that the controversy was moot. We denied the motion as to standing and denied it without prejudice to the parties raising the issue of justiciability in their briefs. In a reply brief, Orsi argues that the "question of whether [Orsi] could represent the child's interests as a prochein ami was ruled upon by [the Appellate Court] when it denied the Defendant's Motion to Dismiss the appeal on that ground." Both parties have apparently confused standing to bring an appeal with standing to bring a petition in the trial court. These are two separate issues. "This court has jurisdiction to determine whether the Superior Court had subject matter jurisdiction to hear [this case]. . . . [The question of whether the Superior Court had jurisdiction] must be decided on the record, after briefs have been filed, and oral argument, if any, has been had." *Drake* v. *Planning & Zoning Commission*, 14 Conn. App. 583, 541 A.2d 1251 (1988). Thus, our determination that Orsi had standing to bring the appeal did not decide the question of whether she had standing to bring the action in the trial court.

## I

We first address Orsi's claims related to the trial court's granting of the commissioner's motion to strike the third count of the complaint, in which Orsi sought a declaratory judgment.[8] As a consequence of granting the motion to strike, the court never reached the merits of that portion of the complaint seeking a declaratory judgment. In fact, the January 21, 1992 "articulation of ruling on request for declaratory judgment" is largely an articulation of the court's decision on the motion to strike. The court clearly stated in its articulation that it refused to rule on the constitutional issue raised by Orsi because "[w]hether or not [the existing DCYS procedure] violates such rights of the child must be raised in an action initiated by one who speaks for the child, as Denise Orsi does not do." The court noted that "[t]he claim that the regulation which barred Denise Orsi from an administrative hearing is unconstitutional from the child's point of view . . . cannot be made by [Orsi]. The claim that [it] is unconstitutional from [Orsi's] point of view cannot be raised in an action which gives her a right to present her placement concerns directly to the court [through a habeas action under § 52-466 (f)]." The court further indicated that the "statute which conferred standing on Denise Orsi to file a habeas action questioning the propriety of a proposed change in placement of her foster child did not give her standing to assert rights on behalf of

---

[8] The commissioner argues that Orsi has not properly preserved this claim for review because no contemporaneous, formal exception was made to the trial court's ruling on the motion to strike. No exception is required with respect to a trial court ruling on a motion to strike. An exception is required in order to make a trial court ruling a ground of appeal only with respect to evidentiary rulings; Practice Book § 288; and jury instructions. Practice Book § 318. Orsi vigorously objected to both the grant of the motion to strike and the denial of the declaratory judgment. This was all that was required to preserve this issue for our review.

the child. The administrative regulation which she now seeks to question is not involved in this proceeding. She has no more standing in this action to question the constitutionality of that regulation than she has to question the regulations of any other department of state government. Since the question of the propriety of that regulation may not be raised by [Orsi] in a habeas action brought pursuant to § 52-466 (f), this court must decline to issue the declaratory judgment sought."[9]

---

[9] In its articulation, the trial court suggested that Orsi may have had standing to challenge the regulation had she actually requested a hearing prior to Christopher's removal and been denied one by DCYS: "The regulation she questions does, indeed, exclude from the administrative hearings which can be demanded by foster parents prior to a foster child's removal to another placement, those removals which are to the homes of natural parents, guardians, or blood relatives. Had Denise Orsi made a formal request for such a hearing and appealed from the denial thereof, the questioned regulation would be at issue, and the declaratory judgment she seeks would be an appropriate relief to be sought. Even then, however, since a foster parent is neither legal custodian, guardian, guardian-ad-litem, counsel, next friend or possessor of residual parental rights, the only due process issues raised by such an administrative appeal would have to be [those] of Denise Orsi herself such as loss of income resulting from such removal, and not those of the foster child. But this is not an administrative appeal since Denise Orsi never requested an administrative hearing . . . ." The commissioner, likewise, has noted in her brief that "[Orsi] did not request a repeal of the regulation nor petition DCYS for a declaratory ruling on the regulation as required [by General Statutes § 4-176]." We do not perceive Orsi's failure to request an administrative hearing as an obstacle to her bringing a facial challenge to the constitutionality of DCYS procedures as the next friend of Christopher. A party is not required to exhaust administrative remedies when purely *constitutional* claims have been raised regarding a challenged regulation, the adjudication of which is exclusively a judicial function. *Savage* v. *Aronson,* 214 Conn. 256, 268–70, 571 A.2d 696 (1990); see also *Housing Authority* v. *Papandrea,* 222 Conn. 414, 423 n.7, 610 A.2d 637 (1992). Moreover, there is no need to "exhaust" administrative remedies when recourse to the agency would be futile; id., 421–22; as in this case, where the regulation states on its face, in clear and unambiguous terms, that a removal hearing "will be denied" when the child "is being placed directly with the parent, parents, legal guardian, or other relative." See id., 436 (*Berdon, J.,* dissenting); *Kosinski* v. *Lawlor,* 177 Conn. 420, 424–25, 418 A.2d 66 (1979); see *Sharkey* v. *Stamford,* 196 Conn. 253, 257, 492 A.2d 171 (1985); *Friedson* v. *Westport,* 181 Conn. 230, 435 A.2d 17

## A

We turn first to the question of whether the trial court properly determined that Denise M. Orsi lacked standing. "Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. *DiBonaventura* v. *Zoning Board of Appeals,* 24 Conn. App. 369, 373–74, 588 A.2d 244, cert. denied, 219 Conn. 903, 593 A.2d 129 (1991), citing *Board of Pardons* v. *Freedom of Information Commission,* 210 Conn. 646, 648–49, 556 A.2d 1020 (1989)." (Internal quotation marks omitted.) *Delio* v. *Earth Garden Florist, Inc.,* 28 Conn. App. 73, 78, 609 A.2d 1057 (1992). "When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . ." (Internal quotation marks omitted.) Id.

"[N]o person is entitled to set the machinery of the courts in operation except to obtain redress for an injury he has suffered or to prevent an injury he may suffer, either in an individual or a representative capacity." *Belford* v. *New Haven,* 170 Conn. 46, 52–53, 364 A.2d 194 (1975). "[W]here a party does not rely upon any specific statute authorizing invocation of the judicial process his standing depends on whether he has a sufficient personal stake in the outcome of the con-

(1980); *Bianco* v. *Darien,* 157 Conn. 548, 554, 254 A.2d 898 (1969). We therefore reject the suggestion that the trial court lacked subject matter jurisdiction to entertain this declaratory judgment action because the plaintiff failed to exhaust administrative remedies.

troversy and he is not entitled to vindicate his own value preferences through the judicial process." (Internal quotation marks omitted.) Id., 54.

The trial court found that Orsi had standing under the habeas statute, General Statutes § 52-466 (f), to raise claims related to the placement of Christopher in his grandmother's home and, therefore, Orsi should not be granted standing to raise similar claims related to his placement by also seeking a declaratory judgment. We do not agree. We note that although there was clearly a controversy between Orsi and DCYS over the validity of the procedures in question, Orsi elected not to raise issues related to her own interests in the third count of the complaint. Rather, her own concerns were addressed in the habeas count. In the declaratory judgment count, she sought to raise only the constitutional rights of Christopher. Therefore, our inquiry first focuses on whether Orsi was a "proper party" to bring the declaratory judgment count on behalf of the minor child, Christopher, as his prochein ami or next friend, in order to challenge the constitutionality of DCYS placement procedures solely as they relate to Christopher's rights. We need not and do not address the question of whether Orsi *herself* had standing to challenge these procedures.[10]

It has long been the rule that "a minor may bring a civil action only by a guardian or next friend. *Lametta* v. *Connecticut Light & Power Co.,* 139 Conn. 218, 220, 92 A.2d 731 [1952]; *Tulin* v. *Tulin,* 124 Conn. 518, 522, 200 A. 819 [1938]; *Cole* v. *Jerman,* 77 Conn. 374, 380, 59 A. 425 [1904]; *Williams* v. *Cleaveland,* 76 Conn. 426, 431, 56 A. 850 [1904]; *McCarrick* v. *Kealy,* 70 Conn.

---

[10] The trial court's determination that Orsi lacked standing to challenge the subject regulation because she had direct access to court under General Statutes § 52-466 (f) is therefore irrelevant, since Orsi did not, in the amended third count of the complaint, seek to challenge this regulation in her own right.

642, 646, 40 A. 603 [1898]; *Clark* v. *Turner,* 1 Root 200 [1790] . . . ." *Collins* v. *York,* 159 Conn. 150, 153, 267 A.2d 668 (1970). "Under our common law an infant may sue *either by next friend or by guardian,* if one has been appointed." (Emphasis added.) *Lametta* v. *Connecticut Light & Power Co.,* supra. There is no requirement that the guardian or next friend be a wholly disinterested or neutral person and, in fact, most often the next friend is a parent of the minor child. See, e.g., *Picketts* v. *International Playtex, Inc.,* 215 Conn. 490, 576 A.2d 518 (1990); *Mather* v. *Griffin Hospital,* 207 Conn. 125, 540 A.2d 666 (1988); *Burns* v. *Hartford Hospital,* 192 Conn. 451, 472 A.2d 1257 (1984); *Duguay* v. *Hopkins,* 191 Conn. 222, 464 A.2d 45 (1983); *Cuartas* v. *Greenwich,* 14 Conn. App. 370, 540 A.2d 1071, cert. denied, 209 Conn. 803, 548 A.2d 436 (1988); *Wooding* v. *Zasciurinskas,* 14 Conn. App. 164, 540 A.2d 93 (1988). To serve as next friend, "no previous appointment by the court is required, and the prochein ami named in the writ is permitted to appear and prosecute in the infant's name, though if [the next friend] is not a proper person or fails to properly discharge his duties, the court may remove him and appoint another person in his place." *McCarrick* v. *Kealy,* supra. The only real test for whether a person attempting to bring an action as the minor's next friend is a proper person to do so is whether that person's interests are *adverse* to those of the child.

The commissioner argues that Orsi should be precluded from next friend status, because "it is clear that [she] herself had a very real and personal interest in the litigation of these issues, separate and distinct from the child's interests." We do not agree. With respect to the declaratory judgment portion of the complaint, Orsi emphasized that the only interests she sought to advance were those of Christopher. Moreover, even the habeas corpus portion of the complaint was brought

to advance the child's best interests. There was no evidence before the trial court suggesting that Orsi was unfit or that any serious conflict of legal interests existed between Orsi and the child that would impair her ability to serve as next friend.[11] This is notably so as Orsi made clear that she was not advancing her own interests but solely those of Christopher.[12]

The commissioner also argues that Orsi was not entitled to serve as next friend because Christopher already had counsel representing his interests. On May 20, 1991, Mangan, who had been appointed to represent Christopher at the January, 1991 neglect proceeding, filed an appearance in the trial court, which also granted Mangan's motion to intervene in the present action. In that motion, Mangan stated that he had "acted as attorney for said minor child continuously through to January 31, 1991, at such time when the minor child was adjudged uncared for and/or neglected and committed to DCYS for a period of eighteen months," and that the "appointment . . . is a continuing appointment to the present. The undersigned is familiar with the facts of the case; he has continued to maintain contact with DCYS, the foster parents, and counsel of record."

---

[11] If the ability to serve as next friend depended on the absence of *any* subjective interest in the outcome of the litigation, certainly most parents would be precluded from serving as next friends in tort actions brought on behalf of their minor children.

[12] We point out that this case differs from *Nye* v. *Marcus,* 198 Conn. 138, 502 A.2d 869 (1985), in which our Supreme Court rejected the foster parents' claim of standing, which was based on an assertion of their foster child's interests. The court noted that a foster parent's interests "may well be in conflict with" those of the foster child. In *Nye,* unlike in the present case, the foster parents were, in addition to attempting to raise the child's right to continuity of care in their home, also attempting to assert their *own* interests in maintaining a foster parent relationship. By contrast, no part of Orsi's complaint was based on her own interest in continuing the foster family relationship. The holding in *Nye* v. *Marcus,* supra, has been legislatively overruled by the enactment of General Statutes § 52-466 (f).

Later, on June 5, 1991, after the case had been transferred to the Superior Court at Plainville, the court determined that Mangan had represented Christopher since May, 1989, and had served as both his counsel and guardian ad litem "all along."[13] During the May 9 proceeding, Orsi's counsel did not object to the appointment of counsel for the child, and in fact her complaint stated that counsel should be appointed. Orsi did, however, object to the appointment of Mangan as the child's counsel, because she contended that it might be necessary to call Mangan as a witness.[14] During the June 5 proceeding, no objection was lodged when the court declared that it considered Mangan to be counsel and guardian ad litem "all along." Rather, Orsi centered her argument on the fact that Mangan received no notice of the proposed back-to-family placement.

We see no reason to disturb the trial court's factual determination that Mangan was and continued to be counsel and guardian ad litem for Christopher from at least the time he was adjudicated neglected in January, 1991.[15] The question, then, is whether, notwith-

---

[13] The court stated: "I would regard [Attorney Mangan] as being counsel and guardian ad litem for Christopher, as [he has] been since May [1989]. . . ."

[14] Because the constitutional claims were based, in part, on an alleged lack of procedural protections afforded to a child when he is removed from foster care and placed with a family member, Orsi intended to have Mangan testify about whether he had received notice from DCYS of the plan to return Christopher to his grandmother's home. This testimony was never developed, because the court granted Mangan's motion to quash a notice of deposition served on him. This testimony also became unnecessary, as the parties later stipulated that Mangan had not received any notice. See footnote 24, infra.

[15] We note that Mangan also filed an appearance on behalf of Christopher for purposes of this appeal, although he did not file a separate brief or participate in oral argument on October 8 and 9, 1992. In fact, Mangan explicitly waived oral argument and adopted the brief of DCYS. Orsi's brief states that when DCYS made its decision to return Christopher to the home of Barbara R., he had no court-appointed counsel. This argument is not grounded on any statute or regulation governing appointment of counsel

standing the appointment of counsel and a guardian ad litem whose duty it was to represent Christopher's legal interests, an action may be brought on behalf of the child by Orsi, who claimed to speak for the child as his next friend, for the sole purpose of challenging DCYS placement procedures.

Although a guardian ad litem is usually the proper person to represent a minor plaintiff, "there are frequently cases when the infant may properly sue by next friend, notwithstanding the existence of such guardian, as when the guardian is absent, or is unwilling or unable to institute or prosecute the required action or appeal . . . . In such cases . . . there seems to be no good reason why actions and appeals may not at least be commenced by an infant by next friend." *Williams* v. *Cleaveland,* supra, 432. Although *Cottrell* v. *Connecticut National Bank & Trust Co.,* 175 Conn. 257, 398 A.2d 307 (1978), involved the interests of an incompetent, the court indicated that "the legal disability of an incompetent is analogous to that of a minor." Id., 264.

In *Cottrell*, the plaintiff had both a guardian ad litem to represent her legal interests and a conservator to manage her affairs. Nevertheless, she brought suit by a next friend in order to appeal a probate order affecting her interests in the settlement of her mother's estate. The court noted that the "guardian ad litem ha[d] not sought and in fact ha[d] refused to appeal from the probate order. The question is, therefore, whether the plaintiff may seek to appeal the probate order when her legally appointed guardian ad litem refuses to do so." Id., 262. The court pointed out that "the purpose

but on testimony Orsi obtained by deposing a seasoned child advocate who has represented children in similar cases. Because we accept the trial court's finding, we need not reexamine whether Mangan's appointment did, in fact, continue "all along" or whether the appointment "expired" at some point before the present action began.

of authorizing a guardian ad litem is to ensure that the interests of the ward are well represented. . . . Its purpose is not . . . 'to burden nor hinder [the ward] in enforcing [his] rights; nor to confer any privilege or advantage on persons claiming adversely to [him].' In order that this purpose be fulfilled, certain exceptional situations warrant the allowance of suit on behalf of the incompetent by a next friend." (Citations omitted.) Id., 263. That is true even where the incompetent's interests would be best served by continuance of the conservator's appointment, in order to allow the situation to be reviewed by the court. Id., 263–64; see also 42 Am. Jur. 2d, Infants § 158 ("even though the infant has a guardian he may sue by next friend unless the guardian dissents; and even if he dissents, a next friend may sue if it is necessary for the ward's benefit").

While *Cottrell* speaks of "exceptional situations," it does not specify when such situations exist. The case does make clear, however, that a crucial factor for the court to consider in allowing an action to be brought by a next friend, where the incompetent or minor already has a guardian ad litem, is whether such a suit will afford a means by which the court can review a claim affecting the incompetent's or minor's interests. The *Cottrell* court noted that "the purpose of providing representation is to ensure that the legal disability imposed [on the incompetent or minor] will not undermine adequate protection of a ward's interest. 39 Am. Jur. 2d, Guardian and Ward, § 1." *Cottrell* v. *Connecticut Bank & Trust Co.,* supra, 264. The court further noted that "a procedure initiated to protect [the child's] interests should not be utilized to hinder [him] in obtaining *a review of any action involving [his] rights.*" (Emphasis added.) Id., 264–65.

Here, the child's court-appointed attorney did not attempt to challenge the DCYS procedures affecting

back-to-family placements.[16] Orsi, the child's foster mother, stepped forward as the child's next friend to raise what was arguably a colorable challenge to the constitutionality of those procedures as they affect the interests of Christopher. If we were to deprive Orsi of the status of next friend to bring this proceeding, we would be foreclosing judicial review of an agency action arguably involving the child's constitutional rights. Id. We therefore conclude that in this case exceptional circumstances exist and an action may be commenced by a next friend for the purpose of protecting Christopher's interests, even though he already has counsel and a guardian ad litem to protect those interests.

We must take our inquiry further, however. The commissioner argues that Orsi was not a "proper person" to bring the action on behalf of Christopher. She notes that Orsi, as a foster parent, "had a very real and personal interest in the litigation of these issues, separate and distinct from the child's interest." She relies on *Judson* v. *Blanchard,* 3 Conn. 579, 581 (1821), for the proposition that "the court will, if [it] disapprove[s] of the prochein amy named, displace him, and if necessary, appoint another." The commissioner contends that Orsi's effort to assume the role of next friend was disapproved by the trial court, which implicitly found her to be not a "proper and responsible person" to bring suit on behalf of the child because her "own interests in the litigation could easily conflict with the child's." The commissioner further argues that "[t]his ruling was well within the court's discretion and authority."

We agree that the decision of whether the next friend is a suitable person to represent the infant is a question for the trial court. *Williams* v. *Cleaveland,* supra, 434. When a child's action is brought by his next friend,

---

[16] We do not necessarily perceive this as indication that the child and his counsel had interests that were adverse. Nor do we view this as indication of Mangan's competence to represent this child's legal interests.

the next friend is subject to the supervision or control of the court, and the court has power to determine whether the litigation is in the child's best interests. See 42 Am. Jur. 2d, Infants § 163. "It is for the benefit of infants who have no guardians, or such as from particular circumstances cannot or will not sue for them, as the case may require, to admit their suits by prochein ami; whose power and responsibility relative thereto, are the same as guardians. And there can be no danger to the infant from such practice; for the court, under whose inspection the suit is prosecuted, is bound to take care for the infant; and, if the prochein ami is not a responsible and proper person, or misconducts the suit, or institutes one not apparently for the benefit of the infant, will displace him, and, if need be, appoint another." (Internal quotation marks omitted.) *Williams* v. *Cleaveland,* supra.

We are thus faced with the issue of whether the trial court abused its discretion in ruling on the motion to strike Orsi's designation as next friend and determining that she was not a "proper and responsible person" to assert rights on behalf of the child. The record indicates that the court granted the motion to strike primarily because it concluded that Christopher was already represented by Mangan as counsel and guardian ad litem. In its articulation, the court stated: "By a motion to intervene granted before [the transfer of the case to the Superior Court at Plainville], Attorney Steven Mangan, who had then represented the child for nearly two years in both neglect proceedings in Juvenile Matters, was permitted to continue acting as the child's counsel and guardian-ad-litem, pursuant to § 17a-102f and § 46b-136 . . . instead of [Orsi's] attorney, a stranger to the case, who had been earlier appointed at the time of issuance of the temporary injunction on the civil side." The court therefore saw no need for a next friend, since it perceived that the

child's interests were already represented. The trial court apparently overlooked the possibility raised in *Cottrell*, that a child may, in exceptional situations, be permitted to bring an action by a next friend even when the child already has counsel or a guardian ad litem.

Nor did the trial court grant the motion to strike because it concluded that the declaratory judgment action was not for the "benefit of the infant." *Williams v. Cleaveland*, supra. Our review of the record indicates that the court never properly separated the claims Orsi was attempting to make under General Statutes § 52-466 (f), and those she sought to raise on Christopher's behalf by seeking a declaratory judgment.[17]

We conclude that Orsi should have been permitted to bring the third count of the complaint on Christopher's behalf, as his next friend. We stress that because that count is brought on the child's behalf, the declaratory judgment action belongs to Christopher, not to Orsi, his prochein ami. "The next friend representing an infant plaintiff is in no sense a party to the action, nor has he any interest in the litigation, but the real party plaintiff in the suit is still the infant." 42 Am. Jur. 2d, Infants § 161. Christopher, therefore—not Denise M. Orsi—is the plaintiff for purposes of this appeal.

## B

We must, however, examine one further aspect of standing: Even if some action may be brought by Christopher through his next friend, we must determine whether he may bring this particular action, which

---

[17] In the course of the June 5, 1991 hearing, the court stated to Orsi's counsel: "Your client has access to a court under a statute, and they've taken advantage of that. It is not necessary for me to even look at the regulations you cite. . . . I couldn't understand why you want me to rule on a regulation that isn't an issue here."

seeks a declaratory ruling that the back-to-family placement procedures of DCYS are unconstitutional. The commissioner contends that this court lacks jurisdiction to consider the merits of Christopher's appeal because his claims are moot. Specifically, the commissioner contends that our determination of the issues "will not result in any practical relief to Christopher, who has already been returned to his grandmother['s custody] . . . where he remains." Our ruling, she states, would have no effect on Christopher, who is no longer in foster care.

" 'It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow.' . . . *Shays* v. *Local Grievance Committee*, 197 Conn. 566, 571, 499 A.2d 1158 (1985)." *Perry* v. *Perry*, 222 Conn. 799, 803, 611 A.2d 400 (1992). This court will not render advisory opinions. See *Moshier* v. *Goodnow*, 217 Conn. 303, 306, 586 A.2d 557 (1991). " 'If there is no longer an actual controversy in which we can afford practical relief to the parties, we must dismiss the appeal.' *Sadlowski* v. *Manchester*, [206 Conn. 579, 583, 538 A.2d 1052 (1988)]." *Board of Education* v. *New Haven*, 221 Conn. 214, 216, 602 A.2d 1018 (1992). At the conclusion of the habeas proceeding, Christopher was removed from the Orsi home and placed with his grandmother, where he now resides. It is clearly impossible for us to afford him the specific practical relief he requests, namely notice and a hearing prior to his removal from foster care. Christopher, in his reply brief, does not dispute that the immediate controversy is moot; rather, he contends that it falls under the "capable of repetition but evading review" exception to the mootness doctrine.

"In the absence of a class action, the capable of repetition, yet evading review doctrine is limited to the situation where two elements combined: (1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] reasonable expectation that the same complaining party would be subjected to the same action again." (Internal quotation marks omitted.) *In re Noel M.,* 23 Conn. App. 410, 413, 580 A.2d 996 (1990). "In deciding whether to invoke this mitigating principle, we [consider] not only the practical difficulties of timely judicial review but also (1) the public importance of the question presented; (2) the potential effect of the ruling on an ongoing program of the state's penal or civil system; and (3) the possibility of a similar effect on the plaintiff himself in the future. . . ." (Citations omitted; internal quotation marks omitted.) *Perry* v. *Perry,* supra; see also *Delevieleuse* v. *Manson,* 184 Conn. 434, 437, 439 A.2d 1055 (1981); *Shays* v. *Local Grievance Committee,* supra, 572–73. These three mitigating factors must all be present in order for the "capable of repetition" exception to apply. *Perry* v. *Perry,* supra. We conclude that they are present here.

There is no question that the action we are asked to review is of great public importance and that our decision will have an impact on the state's foster care system. We focus, therefore, on the third prong of this analysis, the *possibility* of a similar back-to-family placement affecting Christopher. We must examine this factor in light of the record before us. This case is unlike *Shays* v. *Local Grievance Committee,* supra, 574, where the record demonstrated "an isolated incident not likely to be repeated in the foreseeable future." Here, the record indicates that between the date of his birth and the date on which he was finally placed with his grandmother, Christopher was under the protective supervision of DCYS, was placed in the joint custody of his

grandmother and mother, was ousted from his grandmother's home and placed in foster care by his mother, was adjudicated neglected and uncared for and committed to the guardianship and care of DCYS, and was removed from foster care and placed back in his grandmother's home. The record before us shows that Christopher is still "in the system." He is still committed to the custody of DCYS, which has complete control over his placement. In the event his grandmother becomes unable or unwilling to care for him, DCYS may place him with another foster family and then with another family member without affording any preremoval notice or hearing. Under the circumstances, we cannot conclude that there is no "possibility of a similar effect on [Christopher] himself in the future." *Perry* v. *Perry,* supra. Further, because DCYS has complete control over Christopher's placement, it is also possible that any contested placement would terminate before issues related to it could be fully litigated. We therefore conclude that this controversy is capable of repetition but evading review.

## II

We turn now to the merits of Christopher's appeal. He asks us to declare unconstitutional the process by which DCYS effects the removal of a child from longterm foster care and transfers his placement to the home of a family member.[18] While the agency affords notice and the opportunity for a preremoval hearing when a child is removed to another nonrelative foster home, subsection (c) (1) of this regulation states explicitly that a removal hearing will be denied by the

---

[18] While the Juvenile Court never reached the merits of the declaratory judgment count of the complaint, the parties do not dispute that the record before us is adequate to allow a final determination of the constitutional issues presented. *Bruno* v. *Civil Service Commissioner,* 184 Conn. 246, 251, 440 A.2d 155 (1981), on remand, 192 Conn. 335, 472 A.2d 328 (1984).

DCYS hearings unit when the child is being removed and placed directly with the parent, parents, legal guardian, or other relative. Christopher argues that this failure to provide preremoval procedural protections to the child in such a case effects a deprivation of his state and federal constitutional rights to due process and equal protection.[19]

One reason the trial court determined that Orsi lacked "standing" as next friend to seek a declaratory judgment was that the court concluded that the challenged procedures did not implicate *any* constitutional rights of the child:

"[Ms. Smith]: [In a nonfamily placement the] foster mother has the right to request that administrative review or hearing to advance the best interests of the child.

"[The Court]: Okay. But let's not call this a constitutional right of the baby; let's call it what it is, which is a right that's being asserted by the foster mother, who has a quasi-proprietary right in the child that she's known well. . . .

"[Ms. Smith]: It's our position, Your Honor, it's not the right of the foster parent, it's the right of the foster parent to advance the right of the child. . . ."

We thus first address whether Christopher has properly asserted that the absence of certain procedural protections implicates his own constitutional rights. He bases both his procedural due process claim and his equal protection claim on an alleged "fundamental and protected liberty interest in physical safety and personal security" that he claims is substantively protected

---

[19] We note that the plaintiff has not provided a separate analysis of his constitutional claims under the state constitution. We therefore need not independently undertake to engage in such an analysis. *State* v. *Birch,* 219 Conn. 743, 746 n.4, 594 A.2d 972 (1991); *State* v. *Joyce,* 30 Conn. App. 164, 168 n.8, 619 A.2d 872 (1993).

by the fourteenth amendment. "Substantive due process rights are rights such as those listed in the Bill of Rights and those rights held to be so fundamental that a state may not take them away. Among the fundamental rights not listed in the Bill of Rights or incorporated through the fourteenth amendment are such rights as abortion (*Roe* v. *Wade,* 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 [1973]); privacy (*Whalen* v. *Roe,* 429 U.S. 589, 97 S. Ct. 869, 51 L. Ed. 2d 64 [1978]); marriage (*Zablock* v. *Redhail,* 434 U.S. 374, 98 S. Ct. 673, 54 L. Ed. 2d 618 [1978]); and safety and physical movement (*Youngberg* v. *Romeo,* 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 [1982])." *Taylor by and through Walker* v. *Ledbetter,* 818 F.2d 791, 794 (11th Cir. 1987).

The United States Supreme Court has long recognized a liberty interest in safety that cannot be extinguished by an involuntary commitment proceeding. In *Youngberg* v. *Romeo,* supra, the court acknowledged such an interest in a child involuntarily committed to a custodial setting, in that case, a state mental institution. The court noted "that the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause. *Ingraham* v. *Wright,* 430 U.S. 651, 673, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977). And that right is not extinguished by lawful confinement, even for penal purposes. See *Hutto* v. *Finney,* 437 U.S. 678, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978). If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions." *Youngberg* v. *Romeo,* supra, 315–16.

The right to safety afforded to institutionalized mental patients has been extended by analogy to children taken into custody by the state. Foster children have been found to have a similar liberty interest in physi-

cal safety. In *Taylor by and through Walker* v. *Ledbetter*, supra, 795, for instance, the court specifically recognized a foster child's liberty interest in physical safety and held that a child injured by his foster parent could properly maintain a civil rights action under 42 U.S.C. § 1983. The court likened the interest to that in *Youngberg*, stating that "[i]n both cases the state involuntarily placed the person in a custodial environment, and in both cases, the person is unable to seek alternative living arrangements." Id. The foster child, like the child confined to a state mental health facility "has a fourteenth amendment substantive due process liberty interest in reasonably safe conditions." Id.[20] This constitutional right of the child—a liberty interest in safety—is implicated throughout the period during which the state has legal custody of the child and establishes the necessary foundation for both the procedural due process and the equal protection claims asserted by Christopher.

## A

### PROCEDURAL DUE PROCESS

Our procedural due process inquiry is necessarily two-fold. "The fourteenth amendment to the United States constitution provides that the 'State [shall not] deprive any person of life, liberty, or property, without due process of law. . . .' In order to prevail on his due process claim, the plaintiff must prove that: (1) he has been deprived of a [liberty] interest cognizable under the due process clause; and (2) the deprivation of the [liberty]

---

[20] We note that in many civil rights actions by foster children against social service agencies, the existence of the child's constitutional right to physical safety has been unquestioned; the decisions have, instead, turned on other issues, such as whether that right has been violated. See, e.g., *DeShaney* v. *Winnebago County Department of Social Services,* 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989); *Milburn* v. *Anne Arundel County DSS,* 871 F.2d 474 (4th Cir. 1989); *Doe* v. *New York City Department of Social Services,* 649 F.2d 134 (2d Cir. 1981).

interest has occurred without due process of law."
*Tedesco* v. *Stamford,* 222 Conn. 233, 241, 610 A.2d 574
(1992). We have already established that Christopher
has a liberty interest in safety protected by the due pro-
cess clause. It has long been recognized that infringe-
ment by the state on such a substantive right "implies
constitutional recognition of a *procedural* right to be
heard even when a concededly valid government rule
infringing on that interest is enforced." (Emphasis
added.) L. Tribe, American Constitutional Law (2d Ed.
1988) § 10-8, p. 682; see *Board of Regents* v. *Roth,* 408
U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). The
sole issue, therefore, is whether the lack of certain
preremoval procedures deprives Christopher of his
interest in safety without due process of law.

" '[T]he due process clauses of the state and federal
constitutions require that one subject to significant
deprivation of liberty . . . must be accorded adequate
notice and a meaningful opportunity to be heard.' . . .
We note, however, that '[d]ue process, unlike some legal
rules, is not a technical conception with a fixed con-
tent unrelated to time, place and circumstances. . . .
[D]ue process is flexible and calls for such procedural
protections as the particular situation demands. *Mor-
rissey* v. *Brewer,* 408 U.S. 471, 481 [92 S. Ct. 2593,
33 L. Ed. 2d 484] (1972). Accordingly, resolution of the
issue whether the [lack of notice and a hearing in the
context of back-to-family placements are nevertheless]
constitutionally sufficient requires analysis of the gov-
ernmental and private interests that are affected.'
. . . *Mathews* v. *Eldridge,* 424 U.S. 319, 334, 96 S.
Ct. 893, 47 L. Ed. 2d 18 (1976) . . . ." (Citations omit-
ted.) *Tedesco* v. *Stamford,* supra, 242–43.

"The three elements to be considered, as set forth
in *Mathews,* are '[f]irst, the private interest that will
be affected by the official action; second, the risk of
an erroneous deprivation of such interest through the

procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' *Mathews* v. *Eldridge,* supra, 335." *In re Alexander V.,* 25 Conn. App. 741, 744, 596 A.2d 934 (1991), aff'd, 223 Conn. 557, 613 A.2d 780 (1992). In other words, we must determine whether, under the current DCYS scheme, Christopher risks an erroneous deprivation of his liberty interest in safety because of the lack of an adequate procedural safeguard that could be provided for him without disregarding the countervailing interest of DCYS in family reunification and the fiscal and administrative burden on the state.

Applying the *Mathews* criteria to the present case, we conclude that Christopher's right to procedural due process is violated by the current procedures.

The first *Mathews* factor, the significance of Christopher's private interest in physical safety, must not be minimized. Protection of Christopher's physical safety was the primary objective in committing him to the custody of DCYS in the first place. "The public policy of this state as enunciated in General Statutes § 17-38a (a) is [t]o protect children whose health and welfare may be adversely affected through injury and neglect . . . to provide a temporary or permanent nurturing and safe environment for children when necessary . . . ." (Internal quotation marks omitted.) *In re Cynthia A.,* 8 Conn. App. 656, 665, 514 A.2d 360 (1986).

The commissioner contends that the child has a concomitant interest in family reunification that must also be weighed in this balance. She argues that under this first prong of our analysis, the child's interests "must

be balanced with the interests of the state, as 'parens patriae' and the interest of [Barbara R.] in family integrity."

The commissioner is correct that in any child custody matter a number of countervailing interests must be considered. Our Supreme Court has emphasized that these interests must be properly balanced *before* intervention by the state is permissible. "In a hearing on temporary custody . . . the child's interests are very much at issue. . . . [N]o temporary custody order may issue unless the child is suffering from serious physical illness or serious physical injury or is in immediate physical danger. . . . [T]here are two competing interests—the safety of the child and the parent's right of family integrity—at stake in a temporary custody hearing . . . . The child, of course, has an interest both in safety and in family integrity. The state, as parens patriae, represents the safety interest of the child in custody proceedings. This interest must be balanced against the combined family integrity interests of parent and child, which are represented by the parent." *In re Juvenile Appeal (83-CD),* 189 Conn. 276, 298, 455 A.2d 1313 (1983). At the point where coercive intervention becomes necessary, however, "the child's interest no longer coincides with that of the parent, thereby diminishing the magnitude of the parent's right to family integrity . . . and therefore the state's intervention as parens patriae to protect the child becomes so necessary that it can be considered paramount." (Citation omitted.) Id., 287–88.

The initial decision to commit a child to the custody of DCYS is therefore a drastic measure in terms of its effect on the various rights of the parties involved. Once the state has intervened to safeguard the child's physical security, "[t]he primary concern of DCYS is the safety of [the child]. Family integrity can be the goal of DCYS only when such reunion will not endanger the

safety of the child." *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 258, 471 A.2d 1380 (1984). It is undisputed that in many cases the goals of family reunification and protection of the child and his best interests may be mutually exclusive.[21] Throughout the commitment, the child's well-being must underlie any action taken by DCYS on his behalf. This does not negate the important interest of the child or his relatives in family integrity. *Santosky* v. *Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *Moore* v. *East Cleveland, Ohio*, 431 U.S. 494, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977). It simply means that the child's fundamental interest in physical security—the interest initially sought to be protected when the state intervened in his family—remains paramount. Obviously, once the cause for the commitment of the child to DCYS custody ends, the interest in family integrity regains its preeminence and it is "then incumbent on DCYS to reunite the family." *In re Juvenile Appeal (83-CD)*, supra, 291. As long as the child remains in DCYS custody, however, placing a child with relatives does nothing to diminish the priority of *his right* to physical safety.[22]

The second *Mathews* factor to be considered is whether the failure of DCYS to give a foster parent notice and a hearing before a child is removed to the home of a family member creates the risk of an erroneous deprivation of the plaintiff's liberty interest in physical safety. We also examine the probable value of additional procedural safeguards.

Before we examine this *Mathews* factor, we must address the commissioner's contention that Christopher's

[21] See, e.g., A. Solnit, B. Nordhaus & R. Lord (1992), When Home is No Haven (detailed case studies of Connecticut children in protective custody).

[22] See National Commission on Children (1991), Beyond Rhetoric: A New American Agenda for Children and Families, Final Report, p. 299 (placing a child with relatives does not abrogate the state's responsibility to protect his or her health and development).

due process claim is "fatally flawed in that the regulation clearly affords a hearing to a foster parent only and not to the child in her care when that child is removed and placed in a nonfamily placement." The commissioner is correct that the regulation, by its terms, grants a hearing, upon request, not to a foster child, but to his foster *parents,* when DCYS proposes to remove that child from one foster home to another, nonfamily foster home; the regulation does not provide notice and a hearing *to the child.* In a technical sense, it is the foster *parents* to whom this regulation denies notice and opportunity to be heard when a child is returned to the home of a family member. Nevertheless, the rights of the child are directly implicated by these notice and hearing procedures. The hearing is part of an overall scheme intended principally to protect the child's interests. In fact, § 17-37-3 of the same regulation explicitly states that "[t]he Removal Hearing is a proceeding to determine if it is clearly in the child's best interests to be removed from the foster home."[23] We thus find no merit in the commissioner's "fatal flaw" argument.

The commissioner also contends that the risk of erroneous deprivation to the child through present DCYS and statutory procedures is minimal. She notes that the agency is subject to "strict mandates and safeguards imposed by our legislature and to self-imposed safeguards contained in the DCYS regulations. Together, these procedural requirements minimize the risks of erroneous deprivation to the child." Specifi-

---

[23] Section 17-37-3 of the Regulations of Connecticut State Agencies provides: "REMOVAL HEARING

"It is the policy of the department to conduct a hearing on the removal of a child from the foster home hereafter càlled Removal Hearing, when the approved, licensed or relative foster parent disagrees with the department's decision to remove the child from the foster home. *The Removal Hearing is a proceeding to determine if it is clearly in the child's best interest to be removed from the foster home."* (Emphasis added.)

cally, she points to (1) regulations mandating a comprehensive treatment plan for each child, (2) the right to a hearing to contest the proposed plan of action, (3) the requirement that the home where the child will be placed be licensed, including the home of a relative, (4) the right to counsel in a proceeding in which legal custody is at issue, and (5) the foster parents' statutory right to bring a habeas action to contest the removal of a child from their home.

With respect to the first two procedural protections referred to by the commissioner, we note that these procedures must be provided for all foster children who are in the custody of DCYS. We note that with respect to treatment plans, DCYS regulations afford the child or his parent the right to a hearing to address concerns about a treatment plan; the regulations do not provide for any participation by foster parents, however. See §§ 17-421-1 through 17-421-11 of the Regulations of Connecticut State Agencies.

With respect to the third procedural protection, there is a distinction, acknowledged by the commissioner, when the child is to be returned to the home of a relative. General Statutes § 17a-114 permits the agency to place a child with an unlicensed relative for up to forty-five days as long as certain conditions are met.

We view the fourth protection cited by the commissioner with some skepticism. While it is clear that Attorney Mangan was appointed counsel when Christopher was initially committed to the custody of DCYS, it is unclear from the record what degree of involvement Mangan had in Christopher's disposition *after* commitment. Our sole concern here, of course, is with the decision of DCYS to return Christopher to the home of his grandmother. While the trial court stated that it considered Mangan to have been counsel "throughout the proceedings," the record is quite

clear that Mangan received no notice of the decision of DCYS to remove Christopher from Orsi's home.[24] Had Orsi not stepped forward to challenge the agency's decision, it appears that even if Mangan had wanted to question the proposed placement, he would have had no opportunity to do so.

We are similarly unpersuaded that the right of the foster parents tc bring a habeas action, *after* the decision has been made to return a foster child to a family member, fully satisfies the requirements of due process. The opportunity to be heard at a meaningful time and in a meaningful manner is constitutionally required to meet currently accepted standards of procedural due process. *Pet* v. *Department of Health Services,* 207 Conn. 346, 364, 542 A.2d 672 (1988). The cost and delay involved in bringing a postdetermination judicial action as opposed to obtaining an informal, predetermination administrative hearing may be significant. Moreover, unless the foster parent also manages to secure a temporary injunction to prevent removal of the child, the mere filing of a habeas petition may not prevent the agency from actually removing the child before the habeas action has been decided. A preremoval hearing would avoid an after the fact correction of the placement decision and its concomitant disruption of the child's sense of stability and continuity of care.

The incidence of a child's being placed back with family members, some of whom may have been previously adjudged abusive or neglectful, may not be high; the risk may be significant, however, in terms of a

---

[24] At the June 5, 1992 proceeding, in response to Christopher's inquiry as to whether Mangan had received notice of his proposed removal from Orsi's home, the trial court stated: "I can tell you right now . . . that after a child is committed to DCYS, there is no obligation for DCYS to report to the court or to the child's attorney unless we request it. . . . There is no requirement—I made no requirement in this or in any case that I recall that DCYS inform the child's attorney of a proposed change of placement. So I think the parties can stipulate to that."

child's safety. While there are bound to be cases in which even extensive preremoval procedures will not prevent what, in retrospect, is an erroneous placement decision, we are unwilling to use that inevitability to deny the child his right to some very basic procedural protections.

Extending the existing notice and hearing provisions of § 17-37-4 of the regulations to foster parents in all removal situations can only enhance the decision-making process that determines the placement and legal status of the child. Such procedures are designed to ensure that the agency's plan to remove the child from his present foster home reflects a fully informed decision. There is, of course, some danger that foster parents may attempt to use a preremoval hearing inappropriately to block the return of a child to his family. See R. Horowitz, M. Hardin & J. Bulkley, The Rights of Foster Parents (1989), pp. 17–28. We believe this danger is minimal. Moreover, any potential danger is more than offset by the strong possibility that a foster parent who is motivated enough to request such a hearing may actually bring to the attention of DCYS important information about the child or the proposed placement, *known only to the foster parent,* that would cause DCYS to reconsider the child's removal from the foster parent's home. If the safety of some of Connecticut's foster children is ensured by such a process, that more than offsets the slight chance that a hearing may be requested only to delay the planned removal. "It is important, however, to remember that allowing foster parents a hearing is not tantamount to favoring their claim. . . . But a hearing helps assure that information will be presented . . . that is known only to the foster parents or that only foster parents are motivated to present." Id., p. 24.

The third *Mathews* factor concerns the burden on the state of providing this additional procedure. The com-

missioner states that DCYS is a fiscally and administratively overburdened agency and "it is simply unrealistic to expect DCYS to provide administrative hearings every time a family reunification is attempted."

The commissioner offers no support for these claims. It is unclear, for example, how often the existing hearing procedure is employed by foster parents in the context of removals to another nonfamily foster home. Nor is it clear how costly or time consuming such a procedure is. We do agree with the commissioner that this hearing process is unrealistic "every time" a back-to-family placement occurs. Many foster care placements are of short duration. In those situations, the foster parent may not have had time to develop any special knowledge of or insight into the child that would permit him or her to offer meaningful assistance to the agency in its placement decision.[25] Once a child has been in the foster home for one year or more; see Regs., Conn. State Agencies § 17-37-4 (a) (1); the relationship between child and foster parent has developed to the point where such a process can be meaningful. The foster parents, who have had daily contact with the child, have, at this point, become significant figures in the child's life. The child's removal from the foster home is clearly a critical stage in the commitment and a decision not to be undertaken by the agency without careful deliberation. By this time, the foster parents may have gained significant insights into the child and be in a unique position to offer information about the child or the proposed placement that will assist DCYS in its decision making. Their voices must be heard.

We likewise conclude that when a foster child reaches the critical stage at which DCYS plans to remove the

[25] We believe the habeas procedure under General Statutes § 52-466 (f) provides an adequate forum for addressing foster parents' concerns when the placement has been for less than one year.

child from a foster home in which he or she has resided for one year or longer, the child's counsel and guardian ad litem must have some notice of that plan before it is carried out. This notice ensures that counsel for the child has the opportunity to perform the function he or she has been appointed to perform, namely, protect the legal interests of the child.

Affording foster parents notice and the *opportunity* to be heard does not mean that every foster parent will request such a hearing. Nor does it mean that the agency's professional judgment to remove the child from the foster home and place him elsewhere is not entitled to great weight. These notice and hearing procedures, which we hold are constitutionally required, are merely one of an array of necessary safeguards designed to protect foster children and their liberty interest in safety.

## B

### EQUAL PROTECTION

Because we conclude that the procedures by which DCYS removes a child from a foster home and returns him to the home of a family member violate the child's constitutional right to procedural due process, we need not address Christopher's equal protection claim.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment (1) declaring that the existing procedures by which DCYS removes a child from a foster home in which he or she has resided for one year or more and places the child with a family member are unconstitutional and (2) directing that DCYS establish new procedures for such removals in accordance with this opinion.

In this opinion the other judges concurred.