## ELLIS BETENSKY *v.* OPCON ASSOCIATES, INC.

Superior Court       Judicial District of       File No. CV990421034S
New Haven

Memorandum filed April 15, 1999

*Snaider & Garner*, for the plaintiff.

*Schatz & Nobel*, for Opcon Associates, Inc.

I

### INTRODUCTION

BLUE, J. This breach of contract action has been brought by a Canadian resident against an Ohio corporation in a Connecticut court. Although, as this bare statement of facts implies, this scenario raises serious questions of jurisdiction, venue, and forum non conveniens, the motion to dismiss now before the court must, after a full consideration of all of the relevant facts, be denied.

The facts have been submitted by the parties in the form of affidavits and documents. The parties declined an invitation to submit testimonial evidence. The record establishes that on September 1, 1996, the plaintiff, Ellis Betensky, entered into a contract (the contract) with a corporation known as Opcon Associates, Inc. (Opcon

I). Betensky was (and is) a resident of Canada. Opcon I (which, as will be seen, is *not* the "Opcon Associates, Inc." that appears as the defendant in this case) was a Connecticut corporation with its principal place of business in Ohio. There is no evidence as to where the contract was negotiated or signed, but neither party claims that these events occurred in Connecticut.

Betensky was an inventor of optical lenses used in large projection television sets. Opcon I was an optical design service firm founded in 1969 by Betensky and two other persons not parties to the present controversy. Opcon I maintained its place of business in Connecticut from 1969 to 1980, when it moved to New York. Opcon I moved its offices to Betensky's residence in Redding in 1985. The corporate offices remained in Connecticut until 1994, when Betensky moved to Canada and Opcon I moved to Ohio.

The contract was a buy-out agreement between Betensky, who was selling his interest in Opcon I, and Opcon I and two other shareholders, both Ohio residents, who were purchasing Betensky's interest. Part of the contract dealt with a 1979 agreement between Opcon I and a separate corporation known as U.S. Precision Lens, Inc. (Precision). This part of the contract required Opcon I to request Precision to remit certain royalties directly to Betensky. A second part of the contract assigns Betensky certain "CRT Royalties." "CRT" is an acronym for "cathode ray tubes." The contract defines "CRT Royalties" as meaning royalties "[p]ayable or paid on or after September 1, 1996" to Opcon I and its shareholders. The contract additionally requires that Opcon I reimburse Betensky "for his reasonable expenses incurred in connection with his employment by [Opcon I] through August 31, 1996." The contract finally provides that: "This Agreement will be governed by the laws of the State of Connecticut." The contract does not contain a choice of forum clause.

On August 31, 1998, Opcon I, which up to that time had remained a Connecticut corporation, entered into a plan of merger with OPC Merger Corporation, an Ohio corporation. Under the plan of merger, OPC Merger Corporation was to be the surviving corporation, and Opcon I was to be dissolved. It turned out, however, that the Lazarus-like Opcon I would continue to live in name. The plan of merger provided that: "Upon the effective date of the merger, the Articles of Incorporation of OPC Merger [Corporation] shall be amended to change the name of the surviving corporation to 'Opcon Associates, Inc.' " A certificate of merger was filed with the Connecticut secretary of the state on September 4, 1998. As a result of the merger, there is still a corporation known as "Opcon Associates, Inc." with its headquarters in Ohio, but this corporation is, through the alchemy of merger law, the Ohio corporation formerly known as OPC Merger Corporation. This corporation will be referred to as "Opcon II."

Betensky commenced the action now before the court by service of process on December 18, 1998. Betensky is the sole plaintiff. The sole defendant is "Opcon Associates, Inc." The complaint consists of four counts, all alleging breach of contract. The first count alleges that the defendant breached the 1996 contract by failing to require that Precision remit the Precision royalties to Betensky and by interfering with the payment of those royalties in a variety of ways. The second count claims a scrivener's error in the contract's definition of "CR Royalties," alleging that such royalties were to be paid without limitation as to time. The third count alleges that the defendant has failed to provide information, reporting, and accounts pursuant to the contract. The fourth count claims that the defendant has failed to reimburse Betensky for certain travel expenses.

But just who, or what, is "the defendant?" Betensky, who, in December 1998 was unaware of the August

1998 merger, thought he was suing Opcon I. Opcon I, however, was no longer in existence. Process was duly served on a corporation named "Opcon Associates, Inc." at its office in Ohio, and on January 11, 1999, counsel entered a general appearance for the defendant. That defendant, however—the corporation that was actually served—is Opcon II. As things stand now, Opcon II is the defendant in this case.

In terms of substantive liability, this switch in corporate identities is pretty much irrelevant. Under Connecticut law, the surviving corporation in a merger "has all liabilities of each corporation party to the merger." General Statutes § 33-820 (a) (3). Neither party suggests that Ohio law differs from Connecticut law on this point. The assumption of a dissolved corporation's liabilities by the surviving corporation in a merger is, as Opcon II candidly admitted at argument, a staple of corporation law everywhere. Consequently, as Opcon II also admits, it is liable for any breach of contract that Opcon I may have committed. The question presented here is not whether Opcon II is liable, but which court should hear the case of liability.

The motion to dismiss now before the court was timely filed on February 10, 1999. The motion does not attack (or at least does not attack directly) the court's jurisdiction to hear the case. The motion, instead, proceeds on two different grounds. The motion first contends that the provisions of General Statutes § 51-345 (a) (1) do not authorize venue in this judicial district. In the alternative, it argues that the case should be litigated in the Ohio courts and seeks to dismiss the action under the doctrine of forum non conveniens. These contentions must now be addressed in turn.

## II

## VENUE

Opcon II's first argument focuses on our civil venue statute. Section 51-345 (a) (1) provides that, "[i]f all the

parties reside outside this state," civil process shall be made returnable "to the judicial district where (A) the injury occurred, (B) the transaction occurred, or (C) the property is located or lawfully attached." Opcon II observes that, in this case, "all the parties reside outside this state." It additionally contends that (A) no injury occurred in this state, (B) no transaction occurred in this state, and (C) no property involved in the litigation is located in this state or has been lawfully attached in this state. Each of these contentions is entirely accurate. But where does that leave us? Opcon II's oral argument on this point was more ambitious than its written motion. Its motion simply states that the civil venue statute does "not authorize venue in this Judicial District." At argument, however, Opcon II contended more broadly that there is no authorized venue in *any* judicial district in Connecticut. This expanded argument is essential to achieve the goal that Opcon II seeks. If the problem is simply that venue in this judicial district is improper, the remedy is not dismissal, but transfer to another judicial district with more appropriate venue. General Statutes § 51-347b (a); Practice Book § 12-1; see *Richardello* v. *Butka*, 45 Conn. Sup. 336, 717 A.2d 298 (1997). Opcon II does not, however, seek transfer. At argument, it candidly conceded that it had no interest in transfer and that the New Haven judicial district was no more inconvenient to it than any other judicial district in the state. Opcon II seeks dismissal.

Before Opcon II's venue argument can be analyzed properly, the jurisdictional problem lurking conspicuously in the background must be briefly addressed. Opcon II does not formally attack the court's jurisdiction to hear the case. Subject matter jurisdiction is unquestioned. The Superior Court plainly has subject matter jurisdiction to hear the garden-variety breach of contract action presented by this lawsuit. Although in personam jurisdiction is obviously a little more tricky,

Opcon II has chosen not to attack that either. But the basis of in personam jurisdiction must still be identified, if for no other reason than the fact that the existence of such jurisdiction is important to a proper analysis of the venue argument that Opcon II does assert.

It has long been thought that a defendant's domicile in the forum is sufficient to confer personal jurisdiction in a court. L. Brilmayer, An Introduction to Jurisdiction in the American Federal System (1986) p. 21; see *Hutch-inson* v. *Chase & Gilbert*, 45 F.2d 139, 140 (2d Cir. 1930) (L. Hand, J.). In cases involving corporations, from the beginning of American legal practice, the community that has chartered a corporation has occupied "a position somewhat analogous to that . . . of a natural person's domicile. . . ." A. von Mehren & D. Trautman, "Jurisdiction to Adjudicate: A Suggested Analysis," 79 Harv. L. Rev. 1121, 1141 (1966). The United States Supreme Court opined in an early case that "a corporation can have no legal existence out of the boundaries of the sovereignty by which it is created" and that "[i]t must dwell in the place of its creation . . . ." *Bank of Augusta* v. *Earle*, 38 U.S. (13 Pet.) 519, 588, 10 L. Ed. 274 (1839). Although corporation law has obviously evolved since this statement was made, it remains true, as von Mehren and Trautman point out, that a corporation can always be sued in the state which has chartered it. See A. von Mehren & D. Trautman, supra, p. 1161. Thus, there can be no doubt that if Opcon I (which, it will be recalled, was a Connecticut corporation) had remained in existence, it could have been sued in Connecticut with no problem as to in personam jurisdiction.

What is the consequence of Opcon I's merger into the Ohio corporation now known as Opcon II? As already discussed, this merger presents no problem in terms of the *substantive* law of liability. Opcon I's substantive liability for any breach of contract it may have occasioned was assumed by Opcon II upon the merger's

effective date as a corporate bride's negative dowry. An important line of recent cases has concluded that, in cases brought against surviving corporations, this negative dowry has a jurisdictional attachment. "As a general proposition, actions and conduct of a constituent corporation may be attributed to the surviving corporation following a merger for purposes of determining the surviving corporation's amenability to personal jurisdiction for liabilities incurred by the constituent corporation." *Goffe* v. *Blake*, 605 F. Sup. 1151, 1154 (D. Del. 1985).

In technical terms, there is no requirement, in Connecticut or elsewhere, "that, in addition to considering the relationship among the litigation, the forum, and the defendant, the court should take the additional step of examining whether there are continuing contacts with the forum at the time suit is filed." *Nielsen* v. *Sioux Tools, Inc.*, 870 F. Sup. 435, 440 (D. Conn. 1994) (Covello, J.). In terms of policy, there is a concern that if surviving corporations are not subject to personal jurisdiction for the liabilities of merged corporations, "corporations will be encouraged to immunize themselves by fleeing the jurisdiction and formalistically changing their name . . . ." *Bowers* v. *NETI Technologies, Inc.*, 690 F. Sup. 349, 361 (E.D. Pa. 1988). This concern is amply borne out in the present case, which, at the end of the day, does not even involve a formalistic change of name. The realities of modern corporate law involve an "ever increasing frequency of corporate reorganizations." *Simmers* v. *American Cyanamid Corp.*, 394 Pa. Super. 464, 489, 576 A.2d 376 (1990), cert. denied, 502 U.S. 813, 112 S. Ct. 63, 116 L. Ed. 2d 38 (1991). Because of this inescapable fact, policy considerations require that "the forum-related contacts of a predecessor corporation . . . be attributed to its successor for jurisdictional purposes when the successor has

assumed its predecessor's liabilities . . . ." Id.; see *Jeffrey* v. *Rapid American Corp.*, 448 Mich. 178, 529 N.W.2d 644 (1995), and authorities cited therein. Given these considerations, the court has in personam jurisdiction over Opcon II in the present case.

If the court has both subject matter and in personam jurisdiction, the case cannot sensibly be dismissed for want of venue. General Statutes § 51-351 provides that: "No cause shall fail on the ground that it has been made returnable to an improper location." The Connecticut Superior Court is a court of statewide jurisdiction. Our Supreme Court has explained that: "[O]utside the area of administrative appeals, venue is not a jurisdictional but a procedural question . . . ." *State* v. *Kelley*, 206 Conn. 323, 332, 537 A.2d 483 (1998); see *Haigh* v. *Haigh*, 50 Conn. App. 456, 465–66, 717 A.2d 837 (1998), and authorities cited therein.

So what is the court to do if it has jurisdiction but no venue and the case cannot be transferred to another judicial district because no other judicial district has venue either? This is obviously a conundrum, but it is a conundrum with only one solution that is consistent with fundamental judicial values. Courts, as institutions, have an obligation to hear cases properly brought before them. Chief Justice John Marshall long ago explained that this obligation lies at the heart of the judicial function: "It is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is

not given." *Cohens* v. *Virginia,* 19 U.S. (6 Wheat.) 264, 404, 5 L. Ed. 257 (1821).

Given the fact that courts have an institutional obligation to hear and decide the cases brought before them, the common law long ago created what is referred to in judicial disqualification cases as the rule of necessity. Stated succinctly, the rule of necessity is that if everyone is disqualified, no one is disqualified. Thus, in a judicial salary case, where all judges by definition have an interest in the outcome of the case, the judge assigned the case has a duty to hear and decide the case, however disagreeable that task might be. *United States* v. *Will,* 449 U.S. 200, 213–16, 101 S. Ct. 471, 66 L. Ed. 2d 392 (1980). This rule is grounded in "[t]he concept of the absolute duty of judges to hear and decide cases within their jurisdiction . . . ." Id., 215.

An analogous rule of necessity sensibly applies in the context of the present case. The Connecticut Superior Court has jurisdiction over the case. The plaintiff has a right to be heard. No judicial district has venue, but the want of venue does not alter the presence of jurisdiction. A dismissal of the case on the ground that no judicial district has venue would deprive the plaintiff of the fundamental right to hearing and decision that our system of justice guarantees him. The correct rule under these circumstances is that, where every judicial district is disqualified, *no* judicial district is disqualified. The case was made returnable to this judicial district, and, as mentioned, neither party requests that it be transferred to any other judicial district. This court not only has jurisdiction over the case but an obligation to hear the case. The motion to dismiss the case for want of venue must be denied.

III

FORUM NON CONVENIENS

Opcon II seeks, in the alternative, to have the case dismissed pursuant to the doctrine of forum non conve-

niens. This doctrine is succinctly summarized in the Restatement (Second) of Conflict of Laws as holding that: "A state will not exercise jurisdiction if it is a seriously inconvenient forum for the trial of the action provided that a more appropriate forum is available to the plaintiff." 1 Restatement (Second), Conflict of Laws § 84, p. 251 (1971). It must be understood that this doctrine is distinct from the problems of jurisdiction and venue that have already been discussed. "Indeed, the doctrine of forum non conveniens can never apply if there is absence of jurisdiction or mistake of venue." *Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 504, 67 S. Ct. 839, 91 L. Ed. 1055 (1947).

The application of the doctrine of forum non conveniens is, in theory, a matter for the trial court to determine in its discretion based on the particular facts of the case. *Gulf Oil Corp.* itemizes a nonexclusive list of factors, involving both the private interests of the litigants and the somewhat different interests of the public, that the court should consider. Id., 508–509. Factors involving private interests include "the relative ease of access to sources of proof [and] availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses . . . ." Id., 508. Factors of public interest include the administrative difficulty imposed on the court, the burden of jury duty on the citizenry, and the "appropriateness . . . in having the trial . . . in a forum that is at home with the state law that must goven the case . . . ." Id., 508–509.

Although the application of the doctrine is, as mentioned, discretionary in theory, that application is not, at least in Connecticut, quite so discretionary in fact. There is, it turns out, a thumb of significant proportions on the scales of justice. In discussing the private interests to be weighed, *Gulf Oil Corp.* states that, "unless the balance is strongly in favor of the defendant, the

plaintiff's choice of forum should rarely be disturbed." Id., 508. Our Supreme Court has identified this proviso as "the central principle of the forum non conveniens doctrine." *Picketts* v. *International Playtex, Inc.*, 215 Conn. 490, 500, 576 A.2d 518 (1990). Significantly, this statement was made in a case involving foreign (and, by coincidence, Canadian) plaintiffs. The United States Supreme Court has suggested that "a foreign plaintiff's choice deserves less deference" than that of a citizen of the forum state. *Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 256, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981). The Connecticut Supreme Court explained in *Picketts*, however, that, when confronted with this factor, "the trial court must readjust the downward pressure of its thumb, but not remove it altogether from the plaintiffs' side of the scale." *Picketts* v. *International Playtex, Inc.*, supra, 502. "While the weight to be given to the choice of a domestic forum by foreign plaintiffs is diminished, their entitlement to a preference does not disappear entirely." Id. In the end, "it bears emphasis that invocation of the doctrine of forum non conveniens is a drastic remedy . . . which the trial court must approach with caution and restraint." (Citation omitted; internal quotation marks omitted.) Id., 501.

The relevant *Gulf Oil Corp.* factors must now be addressed with this analytical background in mind. With respect to the private interest involved, the relative ease of access of the parties to sources of proof appears at this early juncture to be more or less equal. The plaintiff is located in Canada, and Opcon II's officers and agents are predominantly located in Ohio. (One potential witness, an attorney, is located in New York, but he will be an out-of-state witness regardless of where the case is filed.) Opcon II, the party claiming inconvenience, obviously has access to its own officers and agents. It is likely—no one has argued to the contrary—that most or all of the relevant corporate documents are located

in Ohio, so Opcon II has ready access to that category of evidence as well. The location in which the Ohio witnesses will be deposed by the plaintiff will be fixed by the judicial authority under our rules of practice. Practice Book § 13-29 (c) (2). In implementing this provision, the court has ample discretion to weigh the conveniences of the parties in an evenhanded manner. *Sansone* v. *Haselden*, Superior Court, judicial district of New Haven, Docket Nos. 288329 and 293167 (August 18, 1990) (1 Conn. L. Rptr. 520) *(Berdon, J.)*. The parties in this corporate case do not suggest that unwilling witnesses, requiring compulsory process, are likely to be a significant factor.

The factor which Opcon II most forcefully asserts is the cost of transporting witnesses to Connecticut for trial. It claims in an affidavit that its costs of transportation and lodging "may be . . . tens of thousands of dollars." This figure, however, is not accompanied by any detailed analysis. Significantly, Opcon II declined to present any testimonial evidence in support of its assertions. It is important, in this regard, to consider "modern technological innovations since the United States Supreme Court issued its decision in [*Gulf Oil Corp.*] in 1947." *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 511. Specifically, "videotaped depositions frequently make corporeal transportation of foreign witnesses unnecessary." (Internal quotation marks omitted.) Id. In addition, "with modern transportation and transmission methods, witnesses can attend trials relatively easily in distant places and documents may be transferred almost instantaneously, and . . . conditions imposed by courts can mitigate inconvenience to the parties to a substantial degree." *Stangvik* v. *Shiley Inc.*, 54 Cal. 3d 744, 761, 819 P.2d 14, 1 Cal. Rptr. 2d 556 (1991). Under these circumstances, the inconvenience that Betensky's choice of forum will impose on Opcon

II, while undoubtedly real, can be minimized by a variety of technological means and case management orders.

The public interest factors identified by *Gulf Oil Corp.* must also be considered. All courts in Connecticut (as doubtless in Ohio) are congested, and the present case, like any new case, will necessarily add to the burgeoning list. There is, however, no reason to suppose at this early date that the trial will be especially lengthy or complex. In any event, courts are in the business of hearing cases, and this is hardly a persuasive reason to close the courthouse door. The principal burden in this case, moreover, is likely to fall upon judges, who are paid to be burdened with such things, rather than on jurors drawn from the community. Although tort cases are typically heard by juries, breach of contract cases, such as this, are typically tried to the court. (Many breach of contract cases are claimed to the jury list, but in practice such claims are ordinarily withdrawn prior to trial.) While there is, of course, no certainty in such matters, a jury trial in this case is statistically unlikely.

There is one public interest factor identified by *Gulf Oil Corp.* that does weigh heavily in the pans of justice, and that factor favors Betensky. *Gulf Oil Corp.* states that: "There is an appropriateness . . . in having the trial . . . in a forum that is at home with the state law that must govern the case . . . ." *Gulf Oil Corp.* v. *Gilbert,* supra, 330 U.S. 509. As mentioned, the contract at issue in this case specifies that it will be governed by the law of Connecticut. Although the Ohio courts could, of course, apply Connecticut law if required to do so, *Gulf Oil Corp.* teaches that there is at least some public interest in having a forum at home with the governing law.

The fact that this is a breach of contract case suggests another factor to weigh in the balance as well. Parties in

a tort case are typically unable to negotiate appropriate litigational conditions prior to the time that the cause of action arises. The same is not true in contract cases. The parties to this contract were sophisticated business people represented by counsel. Although the contract contains no forum selection clause, it is likely that the parties contemplated at least the possibility that litigation involving that document would take place in Connecticut. In addition to the choice of law clause already discussed, one party to the contract (Opcon I) was a Connecticut corporation and another party (Betensky) owned property in Connecticut and had historical ties to the state. If Opcon I had wished to have litigation occur in a forum other than Connecticut, it was free to negotiate such a condition. It did not do so, and it is fair to hold that Opcon II, having voluntarily absorbed a Connecticut corporation in a corporate merger, must bear the consequences.

Under these circumstances, what *Picketts* calls "the central principle of the forum non conveniens doctrine"; *Picketts* v. *International Playtex, Inc.*, supra, 215 Conn. 500; must control. "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp.* v. *Gilbert*, supra, 330 U.S. 508. After a full consideration of the submissions of the parties, the court is unable to conclude that the balance of private and public interests tips strongly in favor of the defendant. Opcon II's forum non conveniens argument must consequently be rejected.

## IV

## CONCLUSION

The motion to dismiss is denied.